**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

HORIZON LP UV LENDER, LLC.,
a Delaware Limited Liability Company,

      Plaintiff,

v.                                  CASE NO.

BVM UNIVERSITY VILLAGE, LLC.,
a Florida Limited Liability Company, and
BVM MANAGEMENT, INC., an Indiana
Corporation,

      Defendants.

_____/

**<u>COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES</u>**

      Plaintiff HORIZON LP UV LENDER, LLC ("Horizon"), by its undersigned attorneys, hereby brings the following Complaint against Defendants BVM UNIVERSITY VILLAGE, LLC, and BVM MANAGEMENT, INC., (collectively, "BVM") for Declaratory Relief, Tortious Interference, Abuse of Process, and Slander of Title, and in support thereof states as follows:

**<u>BACKGROUND</u>**

      1.      Plaintiff Horizon is a Delaware limited liability company with its principal place of business in Carlsbad, California.  Horizon is the holder of certain notes (the "Notes") reflecting indebtedness owed to it by Westport Holdings Tampa LP, Westport Holdings Tampa II LP, and Westport Nursing Tampa, LLC.  The corporate parent of these entities, Westport Senior Living Investment Fund, LP (the "Investment Fund"), has provided certain guaranties with respect to the Notes.   Investment Fund and its affiliates pledged all of the limited partnership interests and general partnership interests of Westport Holdings Tampa LP and

Westport Holdings Tampa II, L.P. as additional security for the notes.  Westport Holdings Tampa LP, Westport Holdings Tampa II LP, Westport Nursing Tampa, LLC, Westport Holdings University Village, LLC, and Investment Fund, when referred to collectively, will be referred to herein as the "Westport Entities".

2.    Defendant BVM Management, Inc. is an Indiana nonprofit corporation that owns and/or manages one or more senior living communities in Indiana and Florida, and Defendant BVM University Village, LLC, is a Florida limited liability company.  The principals and members of both companies are John Bartle and Robert L. Rynard, Sr.  Messrs. Bartle and Rynard have portrayed "BVM Management/Westport Holdings, L.P." to be a limited partnership, but this entity (or the fictitious name) does not appear on the database of the Florida Division of Corporations and is potentially merely an alter ego of BVM Management, Inc. BVM University Village, LLC, and/or Messrs. Bartle and Rynard.    When referred to collectively, the Defendants will be referred to herein as "BVM" or Defendants.

3.    As set forth in greater detail below, Defendants – would-be purchasers of the Westport Entities' interest in University Village – have misused Florida's court system to impair Horizon's right to foreclose on its interests pursuant to the Notes.  Defendants have done so by filing a complaint and lis pendens in Hillsborough County Circuit Court in which they falsely represented to the court that BVM possessed a legal right to the University Village real property such that Horizon's closing should be enjoined.  Though the complaint was dismissed, it was dismissed without prejudice, the action remains open, and BVM is in the process of preparing a new complaint.

4.    In the interim, as a result of the pending action, Horizon has been unable to complete the closing, and the status of the already-struggling University Village nursing facility

remains in limbo.  For that reason, Horizon seeks a declaration from this Court that any legal right the Defendants may have had in the real property of University Village has been extinguished, as well as damages for Defendants' tortious interference, abuse of process, and slander of title.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, because this action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over BVM University Village, LLC and BVM Management, Inc. pursuant to Fla. Stat. § 48.193 because both are operating, conducting, or carrying on a business venture in this state, and both have committed tortious acts within this state.  Moreover, BVM University Village, LLC is a Florida resident.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial amount of the events giving rise to these claims occurred in the Middle District of Florida, Tampa Division, and BVM University Village, LLC conducts business within this district.

8.      All conditions precedent have occurred or have been waived.

## GENERAL ALLEGATIONS

9.      The Westport Entities own and operate a continuing care retirement community known as "University Village".  University Village is located in Tampa, Florida, and is comprised of 446 independent living apartments, 46 detached independent living villas, and a

health center known as "The Inn at University Village" which contains 110 assisted living units and 120 skilled nursing units. At present, approximately 550 seniors live at University Village.[1]

10.     The Notes held by Horizon are secured by mortgages encumbering: (i) all of the University Village real property and improvements (the "University Village Property"); (ii) by a senior security interest in all of the assets of Westport Holdings Tampa LP, Westport Holdings Tampa II LLC, and Westport Nursing Tampa, LLC, and; (iii) by a pledge of all of the general partnership interests and limited partnership interests in Westport Holdings Tampa, LP and Westport Holdings Tampa II, LP.

11.     The Notes matured on January 15, 2013. During the first nine months of 2013, Horizon and the Westport Entities entered into successive loan extension agreements to extend the term of the loan.

12.     In mid-2012, the Westport Entities retained a veteran broker who, for nearly 30 years, has specialized in brokering the sale of Continuing Care Retirement Communities ("CCRCs"). This Broker broadly shopped University Village to all known and active buyers of such properties for approximately six months in 2012. This effort resulted in a single prospect interested in buying the community: BVM.

13.     Since at least October 2012, and continuing throughout 2013, the Westport Entities were in negotiations to sell University Village to BVM and its principal John Bartle, who purported to represent BVM Management, Inc. Mr. Bartle repeatedly assured the Westport

---

[1] University Village is an "Entrance Fee" community, meaning new prospective residents pay a substantial entrance fee (typically over $200,000) to obtain the right to occupy the community. The new entry fees are the source of repayment for departing residents, which can be significant. These are mandatory refund obligations by contract and under regulatory law by the Florida Office of Insurance Regulation. Failure to meet these refund obligations requires a statutory appointment of a receiver by the OIR.

Entities that he could secure investors or loans to enable him to purchase University Village and pay all amounts owed to Horizon under the Notes.

14.    On March 26, 2013, one or more of the Defendants, doing business as "BVM Management/Westport Holdings, L.P.", entered into the first of two agreements with Investment Fund whereby Investment Fund agreed to sell to BVM the partnership interests in Westport Holdings Tampa, L.P. and Westport Holdings Tampa II, L.P. for $2,500,000.  Those partnership interests are part of the collateral for the Notes, and as such the agreement required BVM to pay off Horizon as part of the transaction.  This agreement was later terminated and the earnest money refunded because BVM could not secure financing for the purchase price or to repay Horizon.

15.    Having failed to perform under the first contract, during August and September of 2013, Mr. Bartle continued to negotiate with the Westport Entities to enter into another agreement to purchase the limited partnership interests in Westport Holdings Tampa, L.P. and Westport Holdings Tampa II, L.P.

16.    In the meantime, the Notes matured without extension on September 15, 2013.  At that time, Horizon had the legal right to declare the loan in default and pursue its foreclosure and other rights under the loan documents.

17.    Nonetheless, in order to give the Westport Entities additional time to try to sell University Village and pay off the Notes to the only bidding party interested (BVM), Horizon agreed to enter into a final Loan Extension Agreement, dated September 27, 2013, attached as **Exhibit A** (the "Deed In Lieu Agreement").

18.    Section 9 of the Deed In Lieu Agreement specifically contemplates a proposed transaction with BVM.  It states that Horizon and the Westport Entities "acknowledge and agree

that it is in the interest of [Horizon and the Westport Entities] to induce BVM to close such a purchase quickly, in order to preserve the value of the Collateral, and that a lengthy acquisition process would be disruptive to the Community and delay needed changes and improvements to the operation of the Community."

19.    Because of these considerations, the Deed In Lieu Agreement required that any purchase agreement between BVM and the Westport Entities must (a) provide for a purchase price sufficient to repay the Notes; (b) provide for a closing date of no later than December 15, 2013; (c) require a nonrefundable earnest money deposit of $250,000 by October 4, 2013; and (d) require an additional nonrefundable earnest money deposit of $250,000 by November 1, 2013.  The Deed In Lieu Agreement further required that the $500,000 earnest money deposit be applied toward the amounts due Horizon if BVM failed to close its transaction by December 15, 2013.

20.    The Deed In Lieu Agreement further provided that if the full amount owed under the Notes was not repaid by December 15, 2013, the Westport Entities agreed to surrender University Village to Horizon in a carefully negotiated deed in lieu of foreclosure transaction.  In that transaction, Horizon would not only release the Westport Entities of their outstanding obligations to Horizon of approximately $20,000,000 (including the guaranty of the Investment Fund), Horizon would allow the Westport Entities to retain their cash on hand (which, as collateral for the Notes, would ordinarily belong to Horizon) and Horizon would actually supply additional cash to enable the Westport Entities to pay certain unsecured creditors and costs of closing.

21.    Further, Horizon agreed to assume all obligations to the seniors living at University Village.  This includes approximately $9,000,000 owed to those residents under debt

instruments similar to certificates of deposit sold to the residents by the Westport Entities over the years, as well as the Westport Entities' obligation to refund the residents' entrance fees as they came due.  Thus, the total consideration in cash, debt relief, and debt assumption to be paid by the Westport Entities under the Deed In Lieu Agreement was to be well in excess of $30,000,000, without even taking into account the obligation to refund entrance fees.

22.     On or about October 2, 2013, with full knowledge of Horizon's rights to require a deed in lieu of foreclosure if its loans were not repaid by December 15, which were an integral part of the Deed in Lieu Agreement, BVM signed a "Limited Partnership Purchase Agreement," a copy of which is attached as **Exhibit B**.  The Agreement contemplated a purchase by BVM of Investment Fund's partnership interest in University Village.  On or about October 4, 2013, BVM transferred the first $250,000 installment of earnest money to the Westport Entities, and on or about November 1, 2013, BVM transferred the second $250,000 installment to the Westport Entities.

23.     Up until approximately December 13, 2013, BVM asserted that it would be able to close on the purchase of the limited partnership interests on December 15, 2013, as required by the Limited Partnership Purchase Agreement and the Deed In Lieu Agreement.  At the eleventh hour, on December 14, 2013, BVM revealed that it would be unable to close the transaction, and the Westport Entities requested that Horizon provide yet another extension.

24.     At this point, Horizon declined to extend the Notes, and exercised its rights to require the Westport Entities to go forward with the deed in lieu of foreclosure transaction, as outlined in a letter dated December 16, 2013, a copy of which is attached as **Exhibit C**.

25.     From December 16, 2013 until February 13, 2013, Horizon and the Westport Entities worked cooperatively to consummate the transactions contemplated by the Deed In Lieu

Agreement.  During this time, BVM continued to negotiate with the Westport Entities in an attempt to find some way to acquire control of University Village, despite the fact that its purchase agreement had expired on December 15, 2013 and it had failed to perform its requirements or renegotiate any new agreement in which to affect the purchase.  Indeed, as of the date of this Complaint *no such agreement exists*.

26.    In light of BVM's continued efforts, the Westport Entities made several requests that Horizon extend the loan.  In the spirit of cooperation, Horizon made several offers to extend the loan, but BVM and the Westport Entities were unable or unwilling to agree to Horizon's terms.  Horizon made a final offer to extend the loan, on very generous terms (in particular, no extra consideration was required of BVM), in a letter dated January 31, 2014, attached as **Exhibit D**.  BVM and Westport, however, refused the terms offered in the January 31, 2014 letter.

27.    In early February 2014, Horizon and the Westport Entities negotiated and finalized all documents and instruments necessary for the closing of the deed in lieu transaction, and on February 12, 2014 Horizon wired funds in excess of $1,320,000 to its legal counsel to fund its obligations to the Westport Entities under the Deed In Lieu Agreement.  As of February 13, 2014, Horizon was not aware of any material obstacles to the closing of the Deed in Lieu Agreement, and expected to take ownership of University Village on February 14, 2014.

28.    During this transitional period, Horizon hired Life Care Services, LLC ("Life Care"), the largest operator of CCRC's in the country, to manage University Village on its behalf.  Life Care sent a large team of personnel, at Horizon's expense, to University Village.  Life Care's personnel conducted a comprehensive ownership and management transition process during the week of February 10-14, 2014.  This process involved interviewing all employees of

University Village for employment by the new owners, multiple meetings with residents, and copious due diligence work – all undertaken in the expectation that Horizon would own University Village as of February 14, 2014.  The cost of this process was substantial, both in actual cash outlays and in the disruption it caused to the University Village residents and staff.

29.    On Thursday, February 13 – on the eve of the closing – Defendants filed an action in Hillsborough County Circuit Court (the "BVM Action").  A copy of the complaint filed in that action (the "BVM Complaint") is attached as **Exhibit E**.  Along with the Complaint, Defendants filed a lis pendens encumbering the title to the University Village real property.

30.    The BVM Complaint is rife with inaccuracies and outright misrepresentations.  For example, BVM alleged that it "paid the consideration for the acquisition of said 99% ownership interest in the Westport LPs …." and that Defendants were acting "as purchaser of 99% ownership of the Westport LPs".  These statements are patently untrue in several respects.  First, due to Horizon's pre-existing senior lien in the partnership interests, Defendants could not acquire good title to the partnership interests without either repaying Horizon in full or obtaining Horizon's consent, neither of which ever occurred.  Second, and most importantly, Defendants never "paid the consideration for the acquisition" of any limited partnership interests – rather, as is clear on the face of the October 2, 2013 Limited Partnership Purchase Agreement – Defendants failed to close the deal in the time specified therein and failed to deliver the agreed-upon consideration for the partnership interests.

31.    The BVM Action was filed with the sole purpose of delaying the agreed-upon closing of the Deed In Lieu transaction between Horizon and the Westport Entities, an objective that Defendants accomplished.

32.     As an immediate and direct result of the filing of Defendants' frivolous action, the Westport Entities refused to execute the agreed-upon closing documents and consummate the transactions contemplated by the Deed In Lieu Agreement.   Furthermore, Horizon's title insurance company refused to insure title to the University Village Property.  Horizon was forced to extend the closing date of the Deed In Lieu Agreement.  Horizon was also forced to announce to the employees and elderly residents of University Village, who had just been through a disruptive week of activity in the expectation of having a new owner for the community, that the transaction was delayed due to the lawsuit.

33.     The injuries to Horizon as a result of BVM's actions are numerous.  In addition to damages caused by the delayed closing, the expensive work conducted by Life Care was wasted. Defendants' frivolous complaint also placed a cloud of uncertainty over University Village, potentially resulting in lost sales.  Finally, Horizon was forced to expend substantial sums in attorneys' fees defending against the frivolous claim and pursuing alternative arrangements for closing on University Village.

34.     In response to Defendants' complaint, Horizon, through counsel, informed Defendants' counsel that Horizon would seek remuneration from both BVM and its professionals in the event BVM went forward with the BVM Action.  Defendants withdrew their lis pendens on February 19, 2014, and filed a voluntary dismissal, without prejudice, of their complaint on February 27, 2014.  However, in an email to Horizon's principals dated March 2, 2014 – a copy of which is attached as **Exhibit F** – Mr. Bartle has threatened that BVM intends to file a new complaint.

35.     The mere withdrawal of the complaint cannot undo the significant actual damages incurred by Horizon due to Defendants' actions.  Indeed, the fact that Defendants dismissed the

claim without prejudice and has made a clear threat to re-file means that the BVM Action continues to cloud title to the University Village Property, and Horizon's title insurance companies, as of the filing of this Complaint, refuse to provide title insurance coverage without an exception for Defendants' claims.   Horizon is therefore exposed to an ongoing risk that Defendants will revive their frivolous lawsuit, potentially delaying a future planned closing of the Deed In Lieu Agreement and inflicting additional injury to Horizon.

### COUNT I – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

36.     Plaintiff realleges the allegations of Paragraphs 1 through 35 as if fully set forth herein.

37.     When Defendants failed to close the transaction contemplated in the Limited Partnership Purchase Agreement on or before December 15, 2013, any rights it may have had in the Westport Entities' partnership interests in Westport Holdings Tampa LP or Westport Holdings Tampa II, L.P., or the University Village Property, were extinguished.  Nevertheless, Defendants caused to be filed the BVM Action in which they falsely claim that they have legal rights to the University Village Property.

38.     Horizon has a bona fide need for a declaration that Defendants have no legal right in the University Village Property, because absent such a declaration it cannot close on the deed in lieu transaction.

39.     Defendants are the only parties to have an antagonistic interest in the subject matter of this declaration, and they are before this Court.

WHEREFORE, Plaintiff, pursuant to 28 U.S.C. § 2201, seeks a declaration of Defendants' legal rights to the University Village Property and/or the Defendants' interest in the

Westport Entities' partnership interest in the University Village property; specifically, Plaintiff seeks an order from this Court indicating that any such rights have been extinguished.

## COUNT II – TORTIOUS INTERFERENCE

40.    Plaintiff realleges the allegations of Paragraphs 1 through 35 as if fully set forth herein.

41.    There exists a business relationship between Horizon and the Westport Entities as reflected in the Notes and Deed In Lieu Agreement.

42.    Defendants knew of the contractual relationship between the Westport Entities and Horizon; indeed, the Limited Partnership Purchase Agreement between BVM and the Westport Entities specifically contemplated the payment by BVM of the Westport Entities' obligations to Horizon under the Notes as part of the transaction, and BVM was aware of the terms of the Deed in Lieu Agreement.

43.    Defendants intentionally interfered with that relationship when they filed the BVM Action and lis pendens and falsely claimed in the BVM Complaint that Defendants had rights to the University Village Property and/or partnership interests in the Westport Entities owning University Village.  Defendants continue to interfere by refusing to dismiss the BVM Action with prejudice, and threatening to file a new complaint.

44.    As a result of this interference, the Westport Entities did not close on the Deed In Lieu Agreement and Horizon, in turn, has suffered – and continues to suffer – damages, including but not limited to a continued cloud on the title and a detrimental impact on the operations of University Village and, in turn, its value.

WHEREFORE, Plaintiff demands entry of an order awarding Plaintiff's damages incurred as a result of Defendants' actions, and any and all further relief as this Court may deem appropriate.

## COUNT III – ABUSE OF PROCESS

45.    Plaintiff realleges the allegations of Paragraphs 1 through 35 as if fully set forth herein.

46.    In the BVM Complaint, Defendants falsely claimed an interest in the University Village Property and/or partnership interests in the Westport Entities owning University Village.

47.    Defendants filed the BVM Complaint and lis pendens with the ulterior motive of infringing on Horizon's rights in the University Village Property and inhibiting the closing of the deed in lieu transaction.

48.    The BVM Action misuses the power of the court, and Horizon has been damaged as a result.

WHEREFORE, Plaintiff demands entry of an order awarding Plaintiff's damages incurred as a result of Defendants' actions, and any and all further relief as this Court may deem appropriate.

## COUNT IV – SLANDER OF TITLE

49.    Plaintiffs reallege the allegations of Paragraphs 1 through 35 as if fully set forth herein.

50.    When Defendants filed the BVM Action and lis pendens, it communicated to third persons – namely, potential title insurance providers – a statement disparaging Horizon's title to the University Village property.

51.     When Defendants failed to close the Limited Partnership Purchase Agreement on or before December 15, 2013, any rights it may have had in the University Village Property and/or partnership interests in the Westport Entities owning University Village were extinguished.  BVM's Complaint, which is premised on a right that plainly does not exist, is untrue in this regard.

52.     The BVM Action has impaired Horizon's right to foreclose on its interest in the University Village property, and has caused other damages to Horizon.

WHEREFORE, Plaintiff demands entry of an order awarding Plaintiffs damages – including actual damages, special damages, and punitive damages – incurred as a result of Defendants' actions, and any and all further relief as this Court may deem appropriate.

Respectfully Submitted,

/s/Christopher M. Sacco

_____

Christopher M. Sacco
Florida Bar No.:  557420
Donald R. Kirk
Florida Bar No. 105767
CARLTON FIELDS JORDEN BURT, P.A.
4221 W. Boy Scout Blvd., Suite 1000
Tampa, FL 33607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
Email: dkirk@cfjblaw.com (primary)
          csacco@cfjblaw.com (primary)
          kthompson@cfjblaw.com (secondary)
          cstreb@cfjblaw.com (secondary)
          tpaecf@cfdom.net (secondary)

*Counsel for Plaintiff Horizon LP UV Lender, LLC*

# EXHIBIT A

## LOAN EXTENSION AGREEMENT

This **LOAN EXTENSION AGREEMENT** (the "**Agreement**") is entered into effective as of September 27, 2013, by and among Horizon LP UV Lender, LLC, a Delaware limited liability company ("**Lender**"), as successor by assignment to Capmark Bank ("**Capmark**"); **WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP**, a Delaware limited partnership ("**WHT**") and **WESTPORT NURSING TAMPA, L.L.C.**, a Florida limited liability company ("**WNT**") (WHT and WNT, collectively, the "**Borrower**"); and **WESTPORT SENIOR LIVING INVESTMENT FUND, L.P.**, a Delaware limited partnership ("**Westport Senior Living**") and **WESTPORT HOLDINGS TAMPA II, LIMITED PARTNERSHIP**, a Delaware limited partnership ("**Villas Owner**") (Westport Senior Living and Villas Owner, collectively, the "**Guarantors**", and together with Borrower, collectively, the "**Obligors**").

### Recitals

A.    Pursuant to that certain Loan Agreement, dated December 21, 2006, by and between Capmark and WHT, as such Loan Agreement and the other loan documents referenced herein were amended by that certain First Comprehensive Amendment To Loan Documents, dated effective December 21, 2006, by and among WHT; Villas Owner; Westport Senior Living; WNT; Westport Holdings Hidden Springs, L.L.C. ("**WHHS**"); Westport Holdings University Village, L.L.C.; and Capmark (collectively, the "**WHT Term Loan Agreement**"), Capmark loaned to Borrower the sum of Twenty-three Million Fifty Thousand Dollars ($23,050,000.00) (the "**WHT Term Loan**"), which WHT Term Loan was evidenced by that certain Third Amended and Restated Promissory Note, dated December 21, 2006, made by the Borrower in favor of Capmark, as amended that that certain First Amendment to Third Amended and Restated Promissory Note dated March 31, 2010 (the "**WHT Term Note**").

B.    Pursuant to that certain Loan Agreement, dated December 21, 2006, by and between Capmark and WNT, as such Loan Agreement and the other loan documents referenced herein were amended by that certain First Comprehensive Amendment To Loan Documents, dated effective December 21, 2006, by and among WNT; Villas Owner, Westport Senior Living; WHT; WHHS; and Capmark (collectively, the "**WNT Term Loan Agreement**"), Capmark loaned to Borrower the sum of Twelve Million Two Hundred Fifty Thousand Dollars ($12,200,000.00) (the "**WNT Term Loan**"), which WNT Term Loan was evidenced by that certain Third Amended and Restated Promissory Note, dated December 21, 2006, made by the Borrower in favor of Capmark, as amended that that certain First Amendment to Third Amended and Restated Promissory Note dated March 31, 2010 (the "**WNT Term Note**").  The WHT Term Loan and the WNT Term Loan are sometimes referred to herein collectively as the "**Loans**".

C.    The WHT Term Loan and WHT's obligations under the WHT Term Loan Agreement (collectively, the "**WHT Term Loan Obligations**") are secured by, among other things, that certain Second Amended and Restated Mortgage and Security Agreement (University Village), dated December 21, 2006, by and among WNT, WHT and Capmark, and recorded on December 22, 2006, in the Official Records Book

17274, Page 1710, in the Public Records of Hillsborough County, Florida as document number 2006591905 (the "**WHT Mortgage**"). Pursuant to the WHT Mortgage, WHT granted to Capmark a mortgage and security interest in the "**WHT Operational Assets**" as defined below, and certain real property and improvements (the "**WHT Property**") comprising that certain continuing care retirement community located in Tampa, Hillsborough County, Florida, commonly known as "University Village" (the "**WHT Facility**"), the legal description of which is more particularly described in the attached *__Exhibit A__*. The "WHT Operational Assets" are all personal property owned by WHT associated with the ownership and operation of the WHT Facility, including without limitation Accounts, General Intangibles, Permits and Reimbursements Contracts.

D.      The WNT Term Loan and WNT's obligations under the WNT Term Loan Agreement (collectively, the "**WNT Term Loan Obligations**") are secured by, among other things, that certain Second Amended and Restated Mortgage and Security Agreement (University Village), dated December 21, 2006, by and among WNT, WHT and Capmark, and recorded on December 22, 2006, in the Official Records Book 17274, Page 1583, in the Public Records of Hillsborough County, Florida as document number 2006591898 (the "**WNT Mortgage**"). Pursuant to the WNT Mortgage, WNT granted to Capmark a mortgage and security interest in the "**WNT Operational Assets**" as defined below, and certain real property and improvements (the "**WNT Property**") comprising that certain continuing care retirement community located in Tampa, Hillsborough County, Florida, commonly known as "University Village" (the "**WNT Facility**"), the legal description of which is more particularly described in the attached *__Exhibit B__*. The "WNT Operational Assets" are all personal property owned by WNT associated with the ownership and operation of the WNT Facility, including without limitation Accounts, General Intangibles, Permits and Reimbursements Contracts. The WHT Facility and the WNT Facility, together with the Villas Property (as defined below) are sometimes referred to collectively herein as the "**Community**".

E.      The WHT Term Loan Obligations are further secured by, among other things, that certain Assignment of Leases and Rents, dated December 21, 2006, by and between WHT and Capmark, and recorded, in the Official Records Book 17274, Page 1626, Instrument #2006591899, in the Public Records of Hillsborough County, Florida, as amended by that certain Amendment to the Assignment of Leases and Rents dated March 31, 2010 and recorded, in the Official Records Book _____, Page _____, Instrument #_____, in the Public Records of Hillsborough County, Florida (the "**WHT Assignment of Rents**").

F.      The WNT Term Loan Obligations are further secured by, among other things, that certain Assignment of Leases and Rents, dated December 21, 2006, by and between WNT and Capmark, and recorded in the Official Records Book 17274, Page 1751, Instrument #2006591906, in the Public Records of Hillsborough County, Florida, as amended by that certain Amendment to the Assignment of Leases and Rents dated March 31, 2010 and recorded, in the Official Records Book 19811, Page 928, Instrument #2010119472, in the Public Records of Hillsborough County, Florida (the "**WNT Assignment of Rents**").

G.    The WHT Term Loan Obligations and WNT Term Loan Obligations are further secured by, among other things, that certain Exceptions to Nonrecourse Guaranty, dated December 21, 2006, made by Westport Senior Living in favor of Capmark (the **"Carveout Guaranty"**), pursuant to which Westport Senior Living guaranteed the full and prompt payment to Capmark of certain amounts due and owing under the exceptions to non-recourse liability provisions contained in <u>Section 12.19</u> of the WHT Term Note and the WNT Term Note (the **"Carveout Obligations"**), and by that certain Spreader Agreement, dated December 21, 2006, by and among WHT, Villas Owner, and Capmark pursuant to which the real property owned by Villas Owner and more particularly described on ***<u>Exhibit C</u>*** ("**Villas Property**") was pledged to secure the WHT Term Loan Obligations.    The WHT Term Note, the WHT Term Loan Agreement, the WHT Mortgage, the WHT Assignment of Rents, the Carveout Guaranty; that certain Cross-Collateralization, Cross-Default and Mortgage and Loan Document Modification Agreement, dated December 21, 2006 by and among WHT, Villas Owner, and Capmark; that certain Assignment of Licenses, Permits and Contracts, dated December 21, 2006 by and among WHT and Capmark; that certain Agreement To Extend Maturity Dates of Promissory Notes And Establishing Release Conditions For Freedom Village, dated November 1, 2005, by and among WHT and Capmark, among other parties; that certain Spreader Agreement, dated December 21, 2006, by and among WHT, Villas Owner, and Capmark; that certain Debt Service Reserve Escrow And Security Agreement, dated December 21, 2006, by and among WHT, WNT and Capmark; that certain Partnership Interests Pledge Agreement, dated December 21, 2006, by and among Westport Holdings University Village, LLC, Westport Senior Living and Capmark; that certain Partnership Interests Pledge Agreement, dated December 21, 2006, by and among Westport Hidden Springs, LLC, Westport Senior Living and Capmark; all documents and amendments executed in connection herewith, and all other documents evidencing, securing, or relating to the WHT Term Loan, collectively, referred to herein as the **"WHT Loan Documents,"** and all collateral securing the WHT Term Loan Obligations is referred to herein collectively as the **"WHT Collateral"**.    The WNT Term Note, the WNT Term Loan Agreement, the WNT Mortgage, the WNT Assignment of Rents, the Carveout Guaranty; that certain Cross-Collateralization, Cross-Default and Mortgage and Loan Document Modification Agreement, dated December 21, 2006 by and among WNT, Villas Owner, and Capmark; that certain Assignment of Licenses, Permits and Contracts, dated December 21, 2006 by and among WNT and Capmark; that certain Spreader Agreement, dated December 21, 2006, by and among WNT, Villas Owner, and Capmark; that certain Debt Service Reserve Escrow And Security Agreement, dated December 21, 2006, by and among WHT, WNT and Capmark; that certain Partnership Interests Pledge Agreement, dated December 21, 2006, by and among Westport Holdings University Village, LLC, Westport Senior Living and Capmark; that certain Partnership Interests Pledge Agreement, dated December 21, 2006, by and among Westport Hidden Springs, LLC, Westport Senior Living and Capmark; all documents and amendments executed in connection herewith, and all other documents evidencing, securing, or relating to the WNT Term Loan, collectively, referred to herein as the **"WNT Loan Documents,"** and all collateral securing the WNT Term Loan Obligations is referred to herein collectively as the **"WNT Collateral"**.    The WHT Collateral and WNT Collateral are sometimes referred to herein collectively as the **"Collateral"**.

H.    The WHT Loan Documents and WNT Loan Documents were amended by that certain Loan Modification Agreement dated March 31, 2010 (the "**2010 Modification**").

I.    On August 31, 2012, Capmark assigned to Lender all of its right, title, and interest in and to the Loans, the Loan Documents, and the Collateral.

J.    The WHT Loan Documents were subsequently amended by that certain Second Amendment to Loan Documents dated January 9, 2013, that certain Third Amendment to Loan Documents dated February 5, 2013, by that certain Fourth Amendment to Loan Documents dated March 8, 2013, that certain Fifth Amendment to Loan Documents dated April 10, 2013, and that certain Sixth Amendment to Loan Documents dated May 10, 2013. The WNT Loan Documents were subsequently amended by that certain Second Amendment to Loan Documents dated January 9, 2013, that certain Third Amendment to Loan Documents dated February 5, 2013, by that certain Fourth Amendment to Loan Documents dated March 8, 2013, that certain Fifth Amendment to Loan Documents dated April 10, 2013, that certain Sixth Amendment to Loan Documents dated May 10, 2013, and that certain Seventh Amendment to Loan Documents dated September 10, 2013.

K.    On August 8, 2013, Lender loaned $100,000 to WHT (the "**2013 Loan**") pursuant to that certain Promissory Note dated as of August 8, 2013, secured by a Mortgage of even date, recorded in the Official Records Book 22137, Page 1563, Instrument #2013348824, in the Public Records of Hillsborough County, Florida (the "**2013 Loan Documents**").

L.    The WHT Term Loan Obligations, the WNT Term Loan Obligations, and the obligations under the 2013 Loan Documents are sometimes referred to herein collectively as the "**Loan Obligations**". The WHT Loan Documents and the WNT Loan Documents, as amended, and the 2013 Loan Documents, are sometimes referred to herein collectively as the "**Loan Documents**".

M.    The Loans will mature on September 27, 2013. The Obligors have attempted, without success to date, to secure financing sufficient to retire the Loans or to sell the Collateral for a price sufficient to repay the Loans. In addition to the impending maturity of the Loans, Lender has notified Obligors of certain existing defaults that have occurred under the Loan Documents (the "**Alleged Existing Defaults**"). Notwithstanding the foregoing to the contrary, Borrower disputes that the Loans mature on September 27, maintains that it is entitled to certain extensions provided for in the Loan Documents, and likewise disputes that the Alleged Existing Defaults have occurred. One of the purposes of this Agreement is to resolve these disputes.

K.    Lender and the Obligors have determined that it is in their mutual best interest for Lender to forbear from exercising any rights and remedies under the Loan Documents based on the disputed maturity of the Loans on September 27, 2013 or the disputed Alleged Existing Defaults and to enter into this Agreement to provide Obligors with a continuing opportunity to sell the Collateral or secure new financing (the "**Extension**"), and to provide a

mutually beneficial structure for transferring the Collateral to Lender or Lender's Assignee if Obligors are unsuccessful in selling the Collateral or securing new financing during the Extension.

**AGREEMENT**

NOW THEREFORE, in consideration of the foregoing recitals, the sum of $100 paid by Lender to Borrower, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Obligors agree with Lender, and Lender agrees with the Obligors, as follows:

1.    **Acknowledgement of Recitals**.  Obligors and Lender acknowledge and agree that the foregoing "Recitals" are true, correct, and complete, and agree that the same are incorporated by reference into the body of this Agreement.

2.    **Acknowledgement of Current Outstanding Obligations**.  As of the Effective Date, Borrower is indebted to Lender under the Loan Documents in the principal amounts set forth on ***Exhibit D*** attached hereto, in addition to all accrued interest, costs, fees and other charges due and payable under the Loan Documents.  Except as otherwise set forth in this Agreement, Borrower acknowledges and agrees that all Loan Obligations are unconditionally owing by Borrower to Lender and each of the Loan Documents constitutes the legal, valid, and binding obligation of the Borrower in accordance with its respective terms.

3.    **Acknowledgement of Lack of Defenses; Waiver of Extension**.  Except as otherwise set forth in this Agreement, Obligors acknowledge that as of the Effective Date they have no defense, counterclaim, offset, cross complaint, claim or demand of any kind or nature whatsoever (collectively, the **"Defenses"**) that can be asserted to reduce or eliminate all or any part of its liability to repay any indebtedness to Lender or seek affirmative relief for damages of any kind or nature from Lender, which Defenses arise out of or are related to the Loan Documents or, more generally, Obligors' relationship with Lender.  Lender is not in breach of any of the terms or conditions of the Loan Documents or any other agreement between Lender and either Obligor, whether said agreements are oral or written.  There exists no agreement between Lender and either Obligor which is not contained within the Loan Documents and, Obligors have not relied on any course of conduct not specifically described within the Loan Documents. Obligors acknowledge that Lender has at all times acted in good faith in connection with the Loan. Obligors acknowledge that Lender's willingness to enter into this Agreement and the Restructure Loan Documents on the terms and conditions set forth herein and therein are specifically conditioned upon this representation and warranty being true.  Obligors hereby irrevocably waive, relinquish, and forever disclaim any right heretofore granted to Obligors, in the Loan Documents or otherwise, to extend the maturity of the Loan to a date later than December 15, 2013, including, without limitation, the extension rights set forth in the 2010 Modification.

4.    **Acknowledgement of Security Interests**.  Obligors hereby acknowledge, confirm and agree that Lender has and shall continue to have valid, enforceable and

perfected first-priority liens and security interests in the Collateral heretofore granted to Lender pursuant to the Loan Documents or otherwise granted to or held by Lender.  Obligors agree, at the request of Lender, to execute and consent to the filing of any new or additional security agreements, mortgages, UCC-1 financing statements or any other documents, as Lender may require in order to perfect or to continue the perfection of such security interests, consistent with Article 9 of the Uniform Commercial Code and other applicable law.

     **5.**     **Use of Funds**. Obligors shall not use any income generated at the Community for purposes unrelated to the operations of the Community and shall use such amounts only for operational needs of the Community (the "**Eligible Expenses**").  All Eligible Expenses must be in accordance with the Operating Budget attached hereto as ***Exhibit E*** (the "**Budget**") unless mutually agreed by Lender and the Obligors pursuant to monthly Budget review conference calls and confirmed in writing.  Borrower shall provide to Lender a copy of a proposed Budget and financial information sufficient for Lender to confirm that the Budget is consistent with historical operational expenses at the Community.  Without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion, Obligors shall be prohibited from using the Operational Assets to pay any fees, expenses or other costs associated with a facility other than the Community, or to make any payments to or enter into any intercompany loans with any Related Parties of Obligors, other than as required by the existing contracts set forth on the attached ***Exhibit F***, at the rates and on the terms in effect as of the date hereof.  Any amendment, renewal, or termination of such contracts shall be deemed a new transaction requiring Lender's consent under the preceding sentence.

     **6.**     **Extension and Termination**.  The maturity date of the Loan is hereby extended from the Effective Date to December 15, 2013 (the "**Extension Period**").  During the Extension Period, Lender will not seek collections of the Loan Obligations except as set forth herein; provided, however, that the Extension Period shall terminate if (i) any Obligor materially breaches, defaults, or fails to perform, after lapse of all applicable notice or cure periods, any obligation or agreement contained in this Agreement; (ii) any case or other proceeding is instituted by or against any Obligor under any State or Federal law relating to the protection or reorganization of debtors or discharge of debts, including without limitation, the US Bankruptcy Code, 11 U.S.C. § 101, et. seq.; (iii) any default or event of default, other than the Alleged Existing Defaults, occurs under the Loan Documents or this Agreement; (iv) Obligors transfer any funds, Collateral, or other assets in violation of Section 5 hereof; (v) the BVM Agreement (as defined below) is not entered into prior to October 1, 2013, (vi) the BVM Agreement is terminated by either party for any reason after its execution, or (vii) Borrower fails to provide to Lender by October 7, 2013 an estimate of the Post Closing Reserve Budget (as defined below) and unaudited financial statements of Westport Senior Living as of September 30.  Each of the foregoing events is referred to herein as a "**Terminable Event**".  The date the Extension Period terminates pursuant to this paragraph is referenced herein as the "**Extension Termination Date**".  From and after the Extension Termination Date, Lender shall have the option to enforce or exercise any remedies available to it under the Loan Documents, as amended by this Agreement, or exercise its rights under Section 7 of this Agreement.  Lender's election to exercise its rights under Section 7 shall not be deemed to waive or release Lender's rights to enforce or exercise any remedies available to it under the Loan Documents.

#25907679_v2

7.    **Deed in Lieu**.  Borrower agrees that at any time following the occurrence of a Terminable Event, or in any event at any time following the Extension Termination Date, upon Lender's request, Buyer shall be obligated to execute and deliver to Lender or Lender's Assignee, a deed in lieu of foreclosure in a form approved by the parties (the "**Deed in Lieu**"), a Bill of Sale and Assignment, an Assignment and Assumption of Leases and Rents, and an Assignment and Assumption of Licenses, and Rents and Contracts, all in forms approved by the parties, and an Affidavit of No Liens in a form approved by the parties and which permits Lender to obtain an owner's policy of title insurance without exceptions for mechanic's liens and with an effective date as of the time and date of recordation of the Deed in Lieu, together with all other instruments, agreements, and other documents as Lender may reasonably determine, but subject to Borrower's reasonable approval, are necessary or advisable to transfer title to the Collateral to Lender or Lender's Assignee (collectively, the "**Transaction Documents**").  The Transaction Documents shall be subject to the provisions of Section 19 herein relating to Exculpated Parties.  At the Closing (as defined below),  except for the Post Closing Reserve Fund (as defined below), Borrower shall transfer to Lender all Borrower's right, title, and interest in and to all deposits, cash on hand, reserves (including without limitation all reserves held or required by the Florida Office of Insurance Regulation), prepaid fees, permits, easements, utility rights, contracts for sale, hook-up fees, and other development rights (including, without limitation, approvals and authorizations of service providers and governmental entities) pertaining to the Community.

Each of the Transaction Documents shall provide that the rights of Lender or Lender's Assignee therein shall not be merged with the rights of Lender under the Loan Documents and this Agreement, and that the liens created by the Loan Documents and this Agreement shall remain enforceable by Lender notwithstanding Lender's ownership of the Collateral.    The conveyance evidenced by the Transaction Documents shall be subject only to the lien rights of Lender pursuant to the Loan Documents, taxes for the year of closing and other matters approved by Lender in its reasonable discretion.

Upon acceptance of the Collateral by Lender or Lender's Assignee pursuant to the Transaction Documents, Borrower shall deliver to Lender or Lender's Assignee full and unconditional possession of the Collateral.  Notwithstanding the foregoing, Borrower and Lender may mutually agree to allow the Health Center to be leased to a third-party operator or to retain Borrower as a lessee of the Community after transfer of the Collateral to Lender or Lender's Assignee during a transitional period while Lender or Lender's Assignee obtains appropriate licensure for the operation of the Community.

Lender may require Borrower to convey all or part of the Collateral to one or more parties at Closing, which parties may or may not be affiliates of Lender.  Such entities, if any, are collectively referenced herein as "**Lender's Assignee**".

7.1    **Closing**.  The transfer of the Collateral to Lender or Lender's Assignee, if such a transfer should occur under this Section 7, is referenced herein as the "**Closing**".  In the written notice to Borrower requesting the delivery of the Deed in Lieu and other Transaction Documents, Lender shall identify a date for the Closing, which shall be the later of (i) thirty (30) days from the date of such notice or (ii) December 15, 2013 (the

"**Closing Date**"), provided, however, that Lender shall send such written notice within fifteen (15) days after failure by BVM to meet the conditions set forth in Sections 9.1-9.4. Lender may extend the Closing Date for up to thirty (30) days by written notice to Borrower, or may withdraw the request for the Deed in Lieu and terminate this Agreement, in the event any of the following conditions precedent to the Closing are not satisfied by the initially identified Closing Date or any subsequently extended Closing Date:

(a)          Borrower performing and complying in all material respects with all of the terms of this Agreement to be performed and complied with by Borrower prior to or at the Closing.

(b)          Borrower shall have delivered to Lender at least fifteen (15) days prior to Closing, followed at Closing with a revised and updated version thereof, a Closing Schedule (the "**Closing Schedule**"), setting forth: (i) a compilation of the Collateral, (ii) a compilation of, and copies of, all leases and contracts relating to the operation of the Community, (iii) the existing third party obligations of Borrower in support of the Post Closing Reserve Budget (as defined below); (iv) the outstanding accounts receivable of the Community as of the Closing Date and showing dates of service related to each such outstanding account receivable; and (v) the amount of the estimated Post Closing Reserve Fund, as set forth in the notice delivered to Lender pursuant to Section 7.3; in each case satisfactory to Lender in its sole discretion.

(c)          On the Closing Date, all of the representations and warranties of Borrower set forth in Section 15 hereof shall be true, accurate and complete in all material respects, and the delivery of the Deed in Lieu by Borrower to Lender shall constitute Borrower's reaffirmation, on the date thereof, of all such representations and warranties; and Borrower shall, at Lender's request, deliver to Lender a written reaffirmation of all such representations and warranties. Borrower's reaffirmation shall state any changes in said representations and warranties that have occurred from the date hereof as of the Closing Date, but such reaffirmation shall not affect Lender's right to extend the Closing Date or terminate this Agreement if the original representations and warranties are not true, accurate and complete in all respects.

(d)          Lender or Lender's Assignee, as applicable, shall have received all approvals, licenses, permits, consent orders, or other governmental action Lender considers necessary or appropriate to operate the Community after the Closing Date, including without limitation any estoppels required by Lender as to leases and any other agreements affecting the Community, provided, however, that the parties agree that Lender intends to acquire the Community pursuant to Florida Statute Section 651.114(8)(d), and accordingly the approval of the Florida Office of Insurance Regulation shall not be required to satisfy the condition precedent described in this Section 7.1(d).

(e)          There is no material adverse change in the physical condition of the Collateral from the date hereof through the Closing Date.  If the Collateral is subject to a casualty or condemnation between the date hereof and the Closing Date, the provisions of the Loan Documents shall be observed with respect to such event.

(f)          Title to the Collateral shall be satisfactory to Lender, in Lender's sole and absolute discretion, when Lender updates title immediately prior to recordation of the Deed in Lieu; and Lender shall have received, at its option, a commitment to issue title insurance to Lender or Lender's Assignee and a survey of the Community, each in a form satisfactory to Lender.

(g)          The Health Center Leases and all other leases and other agreement which Lender considers necessary or appropriate for the operation of the Community shall be approved and assumed by each tenant/vendor who is a party to such leases and other agreements, and the terms of all such leases and other agreements shall be satisfactory to Lender.

(h)          Lender shall have determined that the Post Closing Reserve Budget and the Post Closing Reserve Fund are in amounts acceptable to it in its sole discretion.

(i)          Lender shall have determined that the representations and warranties of Obligors in this Agreement are true, correct and complete in all material respects on the date when made and on the Closing Date.

7.2     **Conditional Adjustment to Obligations**.  Lender and Borrower agree that as of the date hereof, the fair market value of the Collateral is Twelve Million Dollars ($12,000,000).  Effective as of the date of this Agreement, Lender and Borrower agree that immediately prior to the Closing the Borrower's monetary obligations to Lender shall be reduced from their current balance as of such date to the sum of Twelve Million Dollars ($12,000,000), provided, however, that in the event that this Agreement is terminated by either party prior to the Closing Date, such reduction shall be null, void, and of no effect, Lender's agreement to effect such reduction being contingent in all respects on the occurrence of the Closing.  Borrower and Lender agree that all filings with taxing authorities in connection with the Closing or the period in which the Closing occurs shall reflect such reduction.  Obligors acknowledge that they may have income attributed to them as a result of the release of liability by Lender herein, and Obligors agree that they shall be solely responsible for the payment of taxes attributable to any such income.

7.3     **Post Closing Reserve Budget**.  Notwithstanding anything to the contrary in this Agreement, the parties understand and agree that (a) nothing herein will alter the obligations of Borrower under the Loan Documents to operate the Community and to pay operating costs, and (b) at all times after the Closing, Borrower's obligations to make payments or to fund liabilities that accrue prior to Closing shall be funded through funds

derived from income or existing cash reserves of Borrower and the Post Closing Reserve Fund. Under no circumstances shall Guarantor be required to fund any such expenses out of its own personal funds, except and to the extent required by the Carveout Guaranty. Borrower shall provide to Lender a budget setting forth any payments for which Borrower is responsible (including accrued but unpaid expenses) or which Borrower reasonably anticipates to be necessary to wind up Borrower's business and pay the liabilities set forth in this Agreement and which have not been previously paid, and the amount of funds that will be required to make each such payment, provided that such budget shall not include (a) the minimum liquidity reserve and other amounts which are required to be held by Borrower and to be paid or assigned to Lender at Closing, or (b) any amounts incurred by Borrower in contravention of the Loan Documents or this Agreement. Such budget shall be termed the "**Post Closing Reserve Budget**". The Post Closing Reserve Budget shall also include a contingency item equal to ten percent (10%) of said estimated payments (but calculated without including the Pension Withdrawal Item, as defined below). Borrower shall deliver a non-binding draft of the Post Closing Reserve Budget no later than thirty (30) days prior to Lender's designated Closing Date, and shall deliver the final Post Closing Reserve Budget no later than fifteen (15) days prior to Closing. Lender shall have the right to determine in its sole discretion whether or not the total amount or allocation of funds within the Post Closing Reserve Budget is acceptable to Lender. If Lender disapproves the Post Closing Reserve Budget, at Lender's option, Lender may (i) terminate this Agreement or (ii) delay the Closing for a one (1) month period, during which period Borrower will deliver a revised Post Closing Reserve Budget for Lender's approval or disapproval under this sentence, and the process of review and approval or disapproval shall continue until such time as Lender and Borrower reach agreement on a Post Closing Reserve Budget. If such agreement is not reached within thirty (30) days from the date of the initially identified Closing Date, either Lender or Borrower may terminate this Agreement. After Closing, any increase in the amount of the Post Closing Reserve Budget, and any reallocation of funds among line items in the Post Closing Reserve Budget, shall be subject to the approval of Lender, provided that reallocation of funds from the contingency line item shall not require Lender approval. Lender acknowledges that the Collateral does not, at present, consist of sufficient cash reserves (apart from the Minimum Liquid Reserve, which the parties acknowledge is not available for the Post Closing Reserve) to fund the Post Closing Reserve. When the Post-Closing Reserve Budget is submitted to Lender as set forth herein, Borrower shall identify the amount by which the Community's cash reserves fall short of the amount needed to fund the Post Closing Reserve Budget (the "**Closing Shortfall**"). In the event that Lender approves a Post-Closing Reserve Budget that includes a Closing Shortfall, the Closing Shortfall shall be funded as follows: (aa) first, Westport Senior Living shall provide an amount equal to the net worth of Westport Senior Living, determined on a consolidated basis in accordance with GAAP as of the Closing Date, taking into account reasonable reserves for expenses necessary to wind up and dissolve Westport Senior Living; and (bb) if there is any remaining Closing Shortfall, Lender shall provide the necessary funds.

       **7.4**    **Pension Withdrawal Item.** The Post Closing Reserve Budget shall include an amount for purposes of paying any penalties incurred by Obligors, or any of

them, pursuant to 29 U.S.C. 1381 et. seq. as a withdrawal liability to the SEIU Pension Fund (the "**Pension Withdrawal Item**").    The amount of the Pension Withdrawal Item shall be reduced, dollar for dollar, by any amount paid from the "Pension Contingency" fund established by the Post Closing Reserve Calculation agreement executed by Lender and Westport PBG Holdings Limited Partnership effective as of July 31, 2013.

      **7.5**    **Post Closing Reserve Fund**.    Borrower shall retain at Closing in cash from income or cash reserves an amount equal to the total Post Closing Reserve Budget (the "**Post Closing Reserve Fund**").    Lender's security interest in the Post Closing Reserve Fund shall survive Closing, and Lender and Borrower shall enter into a new or amended security agreement evidencing such security interest at Closing, in a form materially similar to the security agreement executed in connection with the Post Closing Reserve Fund for Westport PBG Holdings Limited Partnership.    After the Closing, Borrower shall promptly make payments to employees, vendors and other parties entitled to payments of such liabilities and shall duly account for the same to Lender.    If, at any time after Closing, Borrower determines that the funds remaining in the Post Closing Reserve Fund are insufficient to pay all amounts actually incurred by Borrower in paying all of its obligations and winding down its business, Borrower shall give prompt written notice of the amount and nature of such deficit to Lender.    If there are any funds in the Post Closing Reserve Fund remaining beyond six (6) months after the Closing, Borrower shall remit any such excess to Lender.

      **7.6**    **No Assumption of Obligor Liabilities**.    Except to the extent expressly set forth in the Transaction Documents, whether in regard to a Closing under this Section 7 or otherwise, Lender and Lender's Assignee will not assume any obligations of Obligors. Obligors expressly acknowledge and agree that Obligors retain all responsibility for all liabilities and obligations incurred by Obligors, known and unknown, contingent or otherwise, whatsoever, including without limitation any obligations of Obligors to Obligors' employees, any obligations of Obligors under any collective bargaining agreement, any obligations of Obligors to make any payments to any pension, retirement, health, or other benefits plan maintained by Obligors or any other party for the benefit of Obligors' employees, any liabilities to any resident of the Community (except as expressly assumed by Lender or Lender's Assignee under an Assignment of Leases and Rents in connection with the Closing, if any), or any liability to any regulatory body for any infraction or noncompliance with any law or regulation.    In the event of a Closing, Borrower shall terminate all contracts pertaining to the Collateral, except for Resident Agreements, at Borrower's expense (to be paid out of the Post Closing Reserve Fund) , as of the Closing Date.    Borrower shall out of the Post Closing Reserve Fund pay all costs of terminating such contracts and all amounts owed to the creditors of Borrower, including, without limitation, all obligations to employees of Borrower for accrued vacation and sick pay and all obligations to any pension, retirement, health, or other benefits plan maintained by Obligors or any other party for the benefit of Obligors' employees.

7.7    **Other Closing Matters**. In the event of a Closing under this Section 7, and without limiting the generality of any other provision herein, the provisions of Sections 18 and 19 shall be observed.

8.    **Modification to Loan Documents**.

8.1    **Extension**.    The maturity date of WHT Term Loan as set forth in the WHT Term Note and the maturity date of the WNT Term Loan as set forth in the WNT Term Note are each hereby changed from September 15, 2013 (the "**Old Maturity Date**") to December 15, 2013 (the "**New Maturity Date**").

8.2    **Amendment**.    All of the Loan Documents are deemed amended, as applicable and necessary, to provide that they continue to apply to the WHT Term Loan and WNT Term Loan, as applicable, as extended by this Agreement, and the Old Maturity Date is amended as and where necessary to be the New Maturity Date for each of the WHT Term Loan and WNT Term Loan.

8.3    **PIP Restrictions**.    Borrower agrees that it will no longer accept, or offer to accept, any new refundable deposits, additional entrance fees, or loans from existing residents of the Community, including without limitation, any deposits pursuant to the "Personal Income Protection Plan" that has heretofore been offered to residents of the Community.    Borrower further agrees that existing Personal Income Protection Plan deposits shall be refunded when they mature in accordance with their terms, unless the resident entitled to such refund desires to renew his or her participation in the Personal Income Protection Plan, in which case Borrower may renew the resident's participation on terms no less favorable to Borrower, and providing for maturation after a term no longer, than those applicable to the resident's maturing deposit.  Borrower shall provide to residents and to the Lender advance written notice of all such refunds and nonrenewals.  The provisions of this Section 8.3 shall not be deemed to restrict Borrower from (i) accepting entrance fees from existing residents of the Community who are renting their units and have not paid entrance fees in the past, or (ii) accepting additional entrance fees from existing residents of the Community when such residents change residences within the Community and the new residence has a higher entrance fee requirement than the previous residence.

8.4    **Reporting**.    In addition to the reporting obligations contained in the Loan Documents, Borrowers shall provide to Lender (i) weekly reports on closed sales of and marketing activities; (ii) weekly reports of move-ins; and (iii) weekly reports of move-outs and refunds of entrance fees and reservation deposits, all in a form reasonable acceptable to Lender.

8.5    **Resident Agreement Limitations**. Except as set forth in  (c) above with respect to accepting entrance fees from residents who are renting or moving within the Community, Borrower shall not, without the prior consent of Lender, enter into any new or amended occupancy agreement with any current or prospective resident of the Community on terms that are materially less favorable to WHT than those offered during

August 2012, including, without limitation, as to entrance fees, monthly facility service fees, refund arrangements, or otherwise.

     **8.6**    **Lender Representative**. Lender may appoint a Lender's representative, who shall be given physical access, upon reasonable notice and at reasonable times, to the Community and shall be entitled to request and receive, at any reasonable time, access to the Community's management personnel and the Community's digital and paper records and files. At Borrower's request, Lender's representative shall execute a mutually agreeable confidentiality agreement requiring Lender's representative protect the privacy of Community residents and comply with HIPAA and other applicable laws. Borrower shall pay all out of pocket expenses incurred by Lender's representative in performing his or her duties, but shall not be responsible for any salary or other compensation for Lender's representative.

     **8.7**    **BVM Agreement**. In the event that the BVM Agreement is not entered into by October 1, 2013, if the BVM Agreement is terminated by either party thereto for any reason thereafter, or if BVM fails to meet the conditions set forth in Sections 9.1, 9.2, and 9.3 below, Lender shall be entitled to require that Borrowers terminate Borrowers' property manager and retain a new manager reasonably acceptable to Lender, on terms and pursuant to a management agreement reasonably acceptable to Lender. Lender agrees that any such replacement manager must maintain insurance policies insuring Lender and Borrower as additional insureds in amounts and under policies customary in the seniors housing industry, and that the management agreement must contain indemnities against losses caused by such replacement manager's negligent or intentional acts reasonably acceptable to Borrower. Lender hereby agrees to defend, indemnify and hold harmless Borrower against any claims, losses or actual out of pocket costs or damages incurred by Borrower arising from acts or omissions of Manager that are not covered by Manager's insurance (and which said insurer agrees to cover), including Borrower's costs incurred in defending against any claim brought against Borrower as a result of such acts or omissions, but such indemnity shall not extend to any costs or damages arising exclusively from Borrower's actions or omissions or include any indemnity for consequential damages, loss of profit, loss of opportunity, loss of value, or other indirect damages. The foregoing indemnity shall also apply in the event Lender requires Borrower to select a new Health Center manager pursuant to Section 11 hereof.

     **8.8**    **Omitted.**

     **8.9**    **Guarantor Consent**. Guarantors hereby consent to the Borrowers entering into this Agreement.

     **8.10**    **Carveout Obligations.** Lender acknowledges that as of the date hereof, it has no knowledge of any liability of Borrower or Guarantor under the Carveout Guaranty.

     **9.**    **BVM Sale Terms**. Lender agrees that Borrowers may continue to negotiate and enter into an agreement (the "**BVM Agreement**") for the sale of the Community to BVM

Management/Westport Holdings, L.P. or other affiliate of BVM Management, Inc. (collectively "**BVM**"). Lender and Borrowers acknowledge and agree that it is in the interest of Lender and Borrowers to induce BVM to close such a purchase quickly, in order to preserve the value of the Collateral, and that a lengthy acquisition process would be disruptive to the Community and delay needed changes and improvements to the operation of the Community. Accordingly, in consideration of Lender's agreements to forbear from exercising any remedies available to it under the Loan Documents during the Extension Period, Borrowers agree not to enter into any agreement with BVM that does not comply with the following terms:

      **9.1**    The BVM Agreement must be executed, delivered, and binding on BVM and Borrowers by October 1, 2013. The BVM Agreement must provide for a purchase price sufficient to repay in full all of the Obligations, and must provide for a closing date of no later than December 15, 2013.

      **9.2**    BVM must provide an earnest money deposit, refundable only by reason of a breach by Borrower, of no less than $250,000, by October 4, 2013.

      **9.3**    . On November 1, 2013, if BVM has not yet closed, BVM must post with Borrower an additional deposit of no less than $250,000, refundable only by reason of breach by Borrower.

      **9.4**    If any of the foregoing milestones are not met by the identified dates, or in any event if BVM has not closed by December 15, 2013, the BVM Agreement shall automatically terminate, and the earnest money deposit, to the extent retained by Borrower, will be applied to the Obligations.

    **10.**    <u>Regulatory Approval of Sale</u>. Any transfer of the Community, whether to BVM or pursuant to Section 7 hereof, is subject to the approval of the Florida Office of Insurance Regulation ("**OIR**"). Accordingly, the parties agree to mutually cooperate in (i) notifying OIR of this Agreement; (ii) notifying OIR at least thirty (30) days in advance of any transfer of the Community; (iii) delivering to BVM, Lender, or Lender's designee any and all information, records, or files, and signing any and all documents and instruments, reasonably required by BVM, Lender, or Lender's Assignee in connection with an application to the OIR regarding a change of ownership of the Community. Notwithstanding the foregoing to the contrary, any transfer to BVM or to Lender shall take place upon receipt of ACHA approval, which, in the case of Lender, Lender agrees to use commercially reasonable efforts to obtain upon a Terminable Event, provided, however, that nothing in this paragraph shall be deemed to restrict Lender's rights to terminate this Agreement under any other provision of this Agreement.

    **11.**    <u>Termination of Health Center Lease</u>. WNT is a party to that certain Lease by and between WNT, as Lessor, and TALF, Inc. and TR & SNF, Inc., both Florida not for profit corporations ("**Lessees**"), dated as of August 13, 2002, as subsequently amended pursuant to a letter dated May 20, 2005, and by that certain Second Amendment to Lease, Revolving Credit Agreement and Service Agreements dated as of November 1, 2007, pursuant to which Lessees occupy and operate the WNT Facility (the "**Health Center Lease**"), as well as a Revolving Credit Agreement dated as of August 13, 2002 (the "**Health Center Revolver**"), pursuant to

which WNT extended a revolving credit facility to Lessees, secured by a Security Agreement and Cash Management Agreement of even date, each as subsequently amended by that certain Second Amendment to Lease, Revolving Credit Agreement and Service Agreements dated as of November 1, 2007 (together with the Health Center Revolver, the "**Health Center Credit Facility Documents**"). Obligors represent and warrant that the Health Center Lease and the Health Center Credit Facility Documents have not been modified or amended except as set forth in the foregoing sentence and that none of the Obligors has received written notice of any claim that such leases are not enforceable in accordance with their terms or that any Obligor is in default with respect to any provision thereof. At any time after Lender has requested a Deed in Lieu pursuant to Section 7 of this Agreement, Lender may instruct Obligors, by written notice, to terminate the Health Center Lease and the Health Center Credit Facility Documents. Upon receipt of such written notice, Lender may select a new manager for the Health Center, and when Lender has selected such new manager, Borrower shall give notice of termination of the Health Center Lease and the Health Center Credit Facility Documents. The termination notice shall provide for an effective date that is thirty (30) days after the date of notice. After giving notice of termination to the Lessees, whether pursuant to this Section 11 or otherwise, Obligors shall cooperate with Lender or BVM, as applicable, to (i) notify the Florida Agency for Health Care Administration ("**AHCA**") of the termination; and (ii) deliver to BVM, Lender, or Lender's designee any and all information, records, or files, and sign any and all documents and instruments, reasonably required by BVM, Lender, or Lender's designee in connection with an application to the AHCA regarding a change of licensing of the WNT Facility to BVM, Lender, or Lender's designee, as applicable.

Notwithstanding the foregoing to the contrary, Lender acknowledges and agrees that at any time after the provisions of Sections 9.1, 9.2, and 9.3 have all been satisfied, Borrower may terminate the Health Center Lease and the Health Center Credit Facility Documents and appoint BVM as new manager of the Health Center, provided that such termination and appointment are conducted in accordance with all applicable governmental requirements for the licensing and operation of the Health Center. Any management agreement with BVM shall be subject to Lender's approval in accordance with the Loan Documents, and in any case shall be on commercially reasonable terms and provide for payments to BVM no less favorable to Borrower than could be obtained from other qualified management companies in the marketplace. Lender agrees to reasonably cooperate with such appointment, but shall not be obligated to waive or surrender any of Lender's rights under the Loan Documents or consent to any modification, disposal or transfer of any Collateral in connection with such appointment. In connection with any such appointment, and as a condition to Lender's approval of BVM's management agreement, BVM shall enter into a commercially reasonable agreement subordinating its rights to the Loan Obligations, including, without limitation, BVM's commitment to cooperate in transitioning the licensing of the Health Center to Lender or Lender's Assignee in the event that BVM fails to purchase the Community and Lender exercises its rights under Section 7 of this Agreement or under the Loan Documents.

## 12. **Operation of Community**.

**12.1 Compliance.** During the term of this Agreement, Borrower shall use its commercially reasonable efforts to conduct, or cause any manager of the Community

or any portion thereof to conduct, the operation of the Community at all times, in all material respects, in accordance with all applicable covenants and restrictions of record and all laws, ordinances, rules and regulations, including, without limitation, all laws, ordinances, rules and regulations relating to zoning, health, building codes, setback requirements, Medicaid and Medicare laws and keep all licenses and permits for the Community in full force and effect. In furtherance rather than limitation of the foregoing, Borrower shall maintain, or shall cause any manager of the Community or any portion thereof to maintain, the standard of care for the residents of the Community in accordance with applicable Federal and State regulations, and shall cause, or cause the manager to cause, all reimbursement contracts, and any other agreements necessary for the use and operation of the Community, or, if applicable, as may be necessary for participation in the Medicaid, Medicare, or other applicable reimbursement programs in which Borrower and/or manager participates (if any) to remain in full force and effect without adverse effect or impact. Borrower shall keep Lender informed, via monthly written reports, of information known to Borrower regarding the Community and operation of the Community. Borrower and Lender shall cooperate to reduce or eliminate any winding up charges or costs associated with termination of the Health Center Lease. Lender agrees that Borrower's ability to cause the Health Center Tenants to comply with the provisions of this Section is limited to the extent of Borrower's rights under the Health Center Lease.

**12.2** **Excess Income**. All income generated by the Community and received by Obligors after payment of all Eligible Expenses at the Community shall be allocated first to the establishment of reserves for purposes of funding the Post Closing Reserve Fund, and any excess after funding of the Post Closing Reserve Fund shall be paid to Lender to reduce the amount of the Obligations.

**12.3** **Payment Limitations**. During the Extension Period, Borrowers shall not take any of the following actions without Lender's consent: (i) pay or agree to pay any amount to any executive level employee of Borrower in relation to the termination of such person's employment, whether designated a severance payment, settlement, or otherwise, except for payments for wages, vacation, or other benefits already accrued; (ii) make any material change in the compensation or benefits of any employee holding an executive-level position; (iii) enter into any contract with any vendor of goods or services except those that can be terminated on no more than thirty (30) days' notice without the payment of any termination fee, liquidated damages, or other charge; (iv) other than as permitted under Section 5, make, or agree to make, any payments to or for the benefit of any Obligor or affiliate of any Obligor, or any owner, employee, officer, director, or agent thereof, including Manager.

**12.4** **Additional Covenants**. Borrower shall abide by the following additional covenants during the term of this Agreement:

(a) Borrower shall continue to: (i) except as set forth in this Agreement, conduct business with respect to the Community in the same manner in which said business has been heretofore conducted and in accordance with all applicable

laws, regulations and ordinances; and (ii) insure the Community substantially as currently insured.

(b) Except pursuant to the BVM Agreement, Borrower shall not sell, mortgage, pledge, hypothecate or otherwise transfer or dispose of all or any part of the Community or any interest therein (except for dispositions of assets that are in the ordinary course of business and, if material, are replaced by similar assets of substantially equal or greater value and utility) without the prior written consent of Lender. Borrower shall not consent to, approve or otherwise take any action with respect to zoning or any other governmental rules or regulations presently applicable to all or any part of the Community. Notwithstanding the foregoing to the contrary, Lender agrees that Borrower may at any time effect a transaction whereby the limited partnership interests in Borrower are transferred to an affiliate of Borrower's general partner.

(c) At all times prior to Closing, Borrower shall not, except in the ordinary course of Borrower's business, enter into any Resident Agreements (as defined in the Loan Documents), any agreements with any vendor, or any other agreement.

(d) Borrower shall not represent to any employee, independent contractor, or vendor employed at or providing services to the Community, or to any union or other representative of any of the foregoing, that BVM, Lender or Lender's Assignee will continue to employ or contract with such person or entity after the transfer of the Community, nor shall Borrower make any representations to any employee regarding the compensation or benefits such employee may receive if employed by BVM Lender or Lender's Assignee after the transfer of the Community.

(e) Except as set forth in Section 10, Borrower shall not make any changes or amendments to, or waive or release any obligations with respect to, the Health Center Lease or the Health Center Credit Facility Documents.

(f) Borrower shall not make any structural alterations to the Community, including, without limitation, any combination of units or any alterations to common areas, without Lender's prior written consent, which may be given, withheld, or conditioned in Lender's sole and unfettered discretion.

(g) Borrower shall not alter the form of Resident Agreement currently in effect, or introduce any new form of Resident Agreement or any new fee structure or payment terms for Community residents, without Lender's prior written consent, which may be given, withheld, or conditioned in Lender's sole and unfettered discretion.

13. **Mutual Release**. In the event of a successful sale of the Community to BVM, Obligors and Lender shall execute mutual releases, pursuant to which the parties shall release, acquit and forever discharge each other, including their respective officers, directors, members,

managers, partners, agents, employees, successors and assigns, from any and all liabilities, claims, demands, actions or causes of action of any kind or nature arising under or in connection with the Loans or the Loan Documents.

14. **Reaffirmation of Loan Documents**. Except as modified by this Agreement, Obligors hereby ratify and reaffirm all of the terms and conditions of the Loan Documents, as amended, to which they are parties, any prior agreements and all other documents executed in connection therewith, including, without limitation, payment of all regular payments due and owning under the Loan Documents, and such terms and conditions shall continue in full force and effect. The Loan will continue to be secured by the Collateral. Obligors shall execute any and all other reasonable documents requested by Lender to implement the terms and conditions of this Agreement.

15. **Representations of Obligors**. Obligors hereby, jointly and severally, represent and warrant to Lender as follows, except to the extent that any of the following specifically refer to representations by Borrower, in which case such representation and warranty shall be made only be on behalf of Borrower, in order to induce Lender to enter into this Agreement:

15.1    Obligors expressly warrant and represent that the consideration each has received or will receive in connection with this Agreement, including, without limitation, Lender entering into this Agreement, is fair, adequate and substantial.

15.2    Each Obligor is a duly formed and validly existing entity under the laws of the state of its formation and is authorized to do business in the State of Florida.

15.3    Each Obligor has full right, power and authority and is duly authorized to enter into this Agreement, to perform each of these covenants on its part to be performed hereunder and to execute and deliver, and to perform its obligations under all documents required to be executed and delivered by it pursuant to this Agreement and this Agreement constitutes the valid and binding obligation of each Obligor enforceable in accordance with its terms.

15.4    The execution and delivery of this Agreement has been duly authorized by all necessary action on the part of each Obligor. This Agreement has been duly executed and delivered by each Obligor.

15.5    Except as may be set forth on *__Exhibit F__* attached hereto, there is no pending condemnation proceeding for the taking of all or any portion of the Collateral for which Borrower has actually received service of process, and Borrower has received no written notice from any governmental agency or official to the effect that any such proceeding is contemplated.

15.6    Except as may be set forth on *__Exhibit F__* attached hereto, there are no lawsuits pending against any Obligor for which such Obligor has actually received service of process, in regard to the leasing, use, or operation of the Collateral, and there

#25907679_v2

are no other lawsuits pending against either Obligor, which, if determined adversely to such Obligor, would adversely affect its ability to perform its obligations hereunder.

**15.7**   Except as may be set forth on *Exhibit F* attached hereto, there are no contracts relating to the Community, and no person or entity has any right or claim with respect to the Community or the business conducted thereon; and the leases and contracts set forth on said *Exhibit F* are enforceable in accordance with their terms, no payment or other default exists thereunder, and no obligations therein have been prepaid.

**15.8**   Neither Borrower is a "foreign person" as defined in Section 1445 of the Internal Revenue Code Section 1445.

**15.9**   There are no residency agreements, leases, subleases (to Borrower's knowledge), licenses or other rental agreements or occupancy agreements (written or verbal) which grant any possessory interest in and to any space situated on or in the Collateral or that otherwise give rights with regard to use of any portion of the Collateral, other than the Resident Agreements listed on *Exhibit F* and the Health Center Lease.

**15.10**   Except as set forth on *Exhibit F*, no material payment or other default exists under the Resident Agreements, the Health Center Leases and the Health Center Credit Facility Documents, and no obligations therein have been prepaid, and Obligors have not provided or received notice of any claim that any of such agreements are not enforceable in accordance with their terms.

**15.11**   Except as set forth on *Exhibit F* attached hereto, and except for defaults cured on or before the date hereof, Borrower has neither (i) received any written notice from any resident of the Community asserting or alleging that Borrower is in material default under such resident's Resident Agreement, nor (ii) sent to any resident of the Community any written notice alleging or asserting that such resident is in default under such resident's Resident Agreement.

**15.12**   Borrower will deliver or make available to Lender true and complete copies of all contracts and agreements that are in Borrower's possession and materially affect the ownership, use and operation of the Collateral.

**15.13**   Except as may be disclosed on *Exhibit F* attached hereto, Borrower has not received written notice from any governmental agency or authority having jurisdiction over the Community of any violations relating to the Community or of any violations of zoning, building, fire, health, ordinance, code, law or regulation which have not been cured as of the date hereof.

**15.14**   Except as may be disclosed on *Exhibit F* attached hereto, Borrower has received no written notice from (i) any governmental agency or authority having jurisdiction over the Community or (ii) any owner of land which is contiguous with the Community, that the Community contains any hazardous or toxic wastes, substances or materials or contaminants, oil, pesticides, radioactive or other materials, the removal of

which is required, or the maintenance of which is prohibited or penalized by any local, state or federal agency, authority or governmental unit or that there are any underground storage tanks at the Community.

**15.15**  No Obligor is insolvent and to Obligors' knowledge will not be, upon retention of the Post Closing Reserve Fund, rendered insolvent by the transactions contemplated by this Agreement.

**15.16**  Except as set forth in ***Exhibit F*** attached hereto and in the title insurance commitment obtained by Lender, the Collateral is not subject to any rights of first refusal, options, easements, restrictions, or encumbrances to which any Obligor is a signatory, whether absolute, accrued, contingent, unasserted, asserted or otherwise.

**15.17**  The assets to be transferred to Lender in a Closing pursuant to this agreement constitute all the assets owned by any Obligor in connection with the Community.

**15.18**  Except as set forth in ***Exhibit F*** attached hereto, all federal, state, county and other taxes due in connection with ownership or operation of the Collateral (exclusive of the Health Center) that are currently due and payable without penalty have been paid in full.

**15.19**  Obligors have not consulted with or contacted any real estate broker, finder, or other intermediary in connection with this Agreement or who would in any case have any right to claim a commission, fee or other compensation in connection the transfer of the Collateral pursuant to this Agreement; and neither Lender nor Lender's Assignee will be obligated to pay any commission, fee, or other compensation arising as a result of any agreement by Obligors with respect to the transfer of the Collateral.

**15.20**  The Obligors have been represented by an attorney in connection with the preparation and review of this Agreement, each Obligor has specifically discussed with its attorney the meaning and effect of this Agreement, and each Obligor has carefully read and understands the scope of each provision contained herein.  No Obligor has relied upon any representation or statement made by Lender or by any representative of Lender with regard to the subject matter, basis, or effect of this Agreement.

**15.21**  Subject to funding the Post Closing Reserve Fund, following Closing, each Obligor will have sufficient funds to pay all creditors and all employee-related obligations, in accordance with Section 7.

**15.22**  The real property described in the WHT Mortgage, the WNT Mortgage, and the Spreader Agreement is currently encumbered by the applicable mortgage and constitutes all the real property on which the Community or any related business of Borrower is located or operated; and the WHT Operational Assets and WNT Operational Assets constitute all the personal property owned by Borrower and used on or in connection with the Community.

Notwithstanding any of the foregoing to the contrary, , Lender acknowledges that Borrower is not in possession or control of the Health Center, and any representation or warranty with respect to the Health Center is to the actual knowledge of Borrower. Lender agrees to make such inquiries of the operator of the Health Center as it requires and may request said operator to provide estoppel certificates in form and substance satisfactory to Lender and shall rely upon the same. .

The representations and warranties of the Obligors set forth in this Agreement shall survive the Closing for a period of twelve (12) months and shall be deemed to be restated at Closing by delivery of the Transaction Documents to Lender, subject to any modifications in writing provided by Borrower to Lender prior to the Closing Date. If Lender knows that a representation or warranty of the Borrower is not correct or accurate and Lender nevertheless elects to close, Lender shall be deemed to have waived reliance thereon and Borrower shall have no liability of any nature thereon.

**16.    No Waiver.** The agreement by Lender to enter into this Agreement and the other Loan Documents, and to comply with the terms hereof and thereof, is without prejudice to Lender's rights and remedies under the Loan Documents, and acceptance of such payments shall under no circumstances be deemed to be a waiver of any Default or Event of Default currently existing under the Loan Documents or any future Default or Event of Default. Nothing herein or in the other Loan Documents shall in any way waive any existing Defaults or Events of Default or diminish, alter, abrogate or adversely affect Lender's remedies. All waiver provisions contained in the Loan Documents remain in full force and effect and shall not be deemed to have been waived by Lender as a result of entering into this Agreement. No failure of Lender to exercise any power given under this Agreement or to insist upon strict compliance with any of the terms or conditions specified in this Agreement shall constitute a waiver of Lender's right to demand exact compliance with the terms of this Agreement.

**17.    Costs and Expenses.**

17.1    The parties will bear their own respective taxes, fees and expenses (including actual attorneys' fees and expenses of counsel for Lender) in connection with the preparation of this Agreement, provided however, in accordance with the terms of the Loan Documents, all fees, expenses and costs incurred by Lender shall be added to the balance of the Obligations secured by the Collateral.

17.2    If, at any time, a default occurs or Lender becomes a party to any suit or proceeding in order to protect its interests or priority in any collateral for any of the Obligations or its rights hereunder or any of the Loan Documents, or if Lender is made a party to any suit or proceeding by virtue of the Loan, this Agreement or any Collateral and as a result of any of the foregoing, Lender employs counsel to advise or provide other representation with respect to this Agreement, or to collect the balance of the Obligations, or to take any action in or with respect to any suit or proceeding relating to this Agreement, any of the other Loan Documents, any Collateral, or to protect, collect, or liquidate any of the security for the Obligations, or attempt to enforce any security

interest or lien granted to Lender by any of the Loan Documents, then in any such events, all of the actual attorney's fees arising from such services, including attorneys' fees for preparation of litigation and in any appellate or bankruptcy proceedings, and any expenses, costs and charges relating thereto (collectively, the **"Costs"**) shall constitute additional obligations pursuant to the Loan Documents, which Costs shall be non-recourse unless such Costs are subject to the Carveout Guaranty.   Such amounts shall constitute a portion of the Obligations, shall be secured by the Collateral and shall bear interest from the date advanced until repaid.

**18.    Closing Costs and Prorations.**   In the event of a Closing under Section 7, the following shall be observed:

**18.1    Costs**.  Lender and each Obligor shall each pay its own legal fees related to the negotiation and preparation of this Agreement (provided that Obligors may pay said fees out of Borrower's existing cash reserves and income before Closing, and from the Post Closing Reserve Fund after Closing to the extent such fees are contained in the Post Closing Reserve Budget) and all documents required to settle the transaction contemplated hereby.  Lender shall pay: (i) all costs associated with its due diligence, including the cost of appraisals, architectural, engineering, credit and environmental reports; (ii) title insurance and title endorsement charges, title examination costs, any costs specified in the preceding sentence as being costs payable by Lender, and all costs associated with Lender's mortgagee title insurance and endorsements, if any, (iii) all recording fees, (iv) all fees, expense and costs incurred in connection with obtaining the Regulatory Approvals (but excluding any costs related to the issuance and maintenance of any permits, licenses and other regulatory approvals prior to the Closing Date); (v) document excise taxes, intangible taxes, and all other transfer taxes imposed in connection with this transaction, and (vi) all survey costs.  All other customary purchase and sale closing costs shall be paid by Borrower or Lender in accordance with the custom in the jurisdiction where the Collateral is located.

**18.2.    Tax Proration**. All ad valorem real estate and personal property taxes on the Collateral shall not be prorated at Closing.

**18.3    Operating Expenses**.  All operating expenses for or pertaining to the Community and either incurred by Borrower or allocable to the period prior to Closing shall be paid by Borrower at or before Closing; and all operating expenses for or pertaining to the Community and either incurred by Lender or Lender's Assignee allocable to the period on or after Closing shall be paid by Lender. Such expenses, including without limitation, public utility charges and all other operating charges of the Community shall be prorated at the Closing effective as of the day before the Closing Date.

**18.4    Existing Funds; Reserves; Deposits; Accounts Receivable and other Income**.  Except for the Post Closing Reserve Fund, all funds owned by Borrower at Closing, all deposit and other accounts, all deposits and reserves held by or for Borrower, all accounts receivable, and any other right of Borrower to receive funds, either from

payments on Resident Agreements or any other source, shall be transferred to Lender at Closing, without any proration. To the extent not required to fund the Post Closing Reserve Fund, Borrower shall pay or assign to Lender at Closing the amount of any reserves or prepayments then held by or on behalf of Borrower, including without limitation, the minimum liquidity reserve.

      **18.5**   **Closing Adjustments**. All prorations and closing payments shall be made on the basis of the closing statement approved by Lender and Borrower in connection with the Closing. Except as otherwise stated, in the event any of the prorations or apportionments made under this Section 18 shall prove to be incorrect for any reason, then any party shall be entitled to an adjustment to correct the same. Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and re-prorated when the information is available. The provisions of this Section 18 shall survive the Closing for a period of six (6) months. Notwithstanding anything in this Section 18 to the contrary, funding for all payments or obligations of Borrower shall be made pursuant to Section 7.5 hereof.

**19.**     **Release of Liability; Non-Recourse Provisions.**

      **19.1**  **Release.**   Notwithstanding anything to the contrary herein, Lender acknowledges and agrees that Guarantor has no personal liability under the Loan Documents accruing from and after March 31, 2010 and under this Agreement and the Transaction Documents (and the Transaction Documents shall specifically so provide) other than for the Carveout Obligations, and that none of the partners of Guarantor or the general and limited partners of Borrower or any officer, director, shareholder, manager, or employee of any general or limited partner now has or will have any obligation to Lender Parties under the Loan Documents (which for purposes of this Section 19 shall include this Agreement and the Transaction Documents) after the Closing except with respect to loss resulting from a Carveout Obligation, provided, however, that nothing in this Agreement or the Transaction Documents will have the effect of either (a) releasing Borrower, Guarantor or any such other person or entity from any liabilities that arise or exist under loan and other documents that are related to La Posada, or (b) releasing the general partner of Borrower if as a matter of law the continuing liability of such general partner or the naming of the general partner in any action to enforce the Loan Documents is required in order for Lender to enforce the Loan Documents and the Transaction Documents against Borrower, provided that in no event shall such liability extend to any officer, director, employee, shareholder, manager, member or employee of the general partner . The Guarantor, said limited and general partners of Borrower and said officers, directors, shareholders, managers, members or employees are hereinafter termed the **"Exculpated Parties"**. The provisions of this Section 19 shall survive the termination of this Agreement and the Closing. In the event of a Closing under Section 7, then in consideration of Obligors' cooperation under this Agreement, Lender Parties shall accept the Deed in Lieu and the other Transaction Documents as full and complete satisfaction of Exculpated Parties' personal liability under the Loan Documents, provided that:

(a)     the Loan Documents shall continue to secure the obligations of Borrower, without any personal liability of the Exculpated Parties, in order that Lender may, at any time, enforce the lien of the Loan Documents as it considers necessary.

(b)     the satisfaction of Exculpated Parties' personal liability under the Loan Documents shall not be deemed to release the Borrower from any obligations under this Agreement nor release Lender's security interest in the Post Closing Reserve Fund, provided that any personal liability of the Exculpated Parties under this Agreement shall be limited to Carveout Obligations.

(c)     Such obligations will remain fully enforceable against the Borrower (but not the Exculpated Parties) if Borrower (i) fails to deliver to Lender, on request, any of the Transaction Documents without qualification or condition,  or (ii) an Obligor becomes a debtor in any bankruptcy action, assignment for the benefit of creditors, or other insolvency or related proceeding which limits, or might limit the rights of Lender to enforce any obligations under the Loan Documents or this Agreement.

    **19.2.    Exceptions to Release**.  Obligors shall remain obligated to Lender for any losses suffered by Lender as a result of any Carveout Obligations.  The obligations of Borrower under the Loan Documents, subject to the modifications set forth in this Agreement, shall, at the sole and absolute discretion of Lender, be immediately revived and reinstated, subject in any event to the provisions of Section 19 regarding personal liability of the Exculpated Parties, and be given effect as fully as though the Loan Documents (even if not then in full force and effect) were in full force and effect if:

(a)     The conveyance of the Collateral, or any portion thereof, by Borrower to Lender and Lender's Assignee pursuant to this Agreement shall be set aside, voided, annulled or invalidated or declared unenforceable, or shall be subordinated to the claims of any other creditor of Borrower by any court of law or other tribunal of competent jurisdiction, in whole or in part, or;

(b)     Any obligations of Borrower under this Agreement, or any material term of, or action taken pursuant to, this Agreement shall be annulled or invalidated, declared unenforceable, or reversed, by any court of competent jurisdiction.

    The foregoing limitations on the personal liability of the Exculpated Parties shall not impair the validity of the Loan Documents or this Agreement or of the indebtedness and obligations evidenced and secured thereby or the lien of, or security interests created by, the Loan Documents and this Agreement or the right of Lender to foreclose and/or enforce the Loan Documents and this Agreement.  Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 362, 506(a), 506(b),

1111(b) or any other provision of the Bankruptcy Reform Act of 1978, as at any time amended or reinstated, to seek relief from the automatic stay, file a claim for the full amount of the debt owing to Lender (provided personal liability of the Exculpated Parties shall be limited to Carveout Obligations in the event an Obligor should become the subject of a petition for bankruptcy or reorganization or to require that all collateral under the Loan Documents shall continue to secure all of the indebtedness owing to Lender in accordance with the Loan Documents and this Agreement.

**20.    Bankruptcy**. In addition to, and not in limitation of, the provisions of Section 19 above, should an Obligor file a voluntary petition under Title 11 of the U.S. Code, as amended, or should an involuntary petition under Title 11 of the U.S. Code, as amended, be filed against an Obligor which involuntary petition is not dismissed within sixty (60) days of its filing, in each case within twelve (12) months after the Closing Date, this Agreement shall be in default and the obligations of the Obligors under the Loan Documents (other than any personal liability of the Exculpated Parties) shall, at the sole and absolute discretion of Lender, be immediately revived and reinstated and be given effect as fully as though the Loan Documents (even if not then in full force and effect) were in full force and effect. Obligors each agree that, in consideration of the recitals and mutual covenants contained herein, and for other good and valuable consideration, including the forbearance of Lender from exercising the rights and remedies otherwise available to it, the receipt and sufficiency of which are acknowledged, in the event Borrower (i) files with any bankruptcy court of competent jurisdiction or becomes the subject of any petition under Title 11 of the U.S. Code, as amended; (ii) becomes the subject of any order for relief issued under such Title 11 of the U.S. Code, as amended; (iii) files or becomes the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors; (iv) seeks or consents to or acquiesces in the appointment of any trustee, receiver, conservator, or liquidator; or (v) becomes the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Lender shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the U.S. Code, as amended, or otherwise, on or against the exercise of the rights and remedies otherwise available to Lender under the Loan Documents, and as otherwise provided by law, provided, however, that any personal liability of the Exculpated Parties shall be limited to Carveout Obligations.

**21.    Modification to Loan Documents**. The Loan Documents are hereby modified to incorporate all terms and conditions set forth in this Agreement. In the event that :Lender's counsel determines that any of the Loan Documents must be individually amended, or that any such amendments must be recorded, in order to preserve Lender's rights under the Loan Documents or Lender's security interest in the Collateral, Borrower agrees to execute and deliver any documents or instruments reasonably requested by Lender, provided that no such amendment shall change the substance of any Loan Document in a manner that is inconsistent with the provisions of this Agreement.

**22.    Headings; Definitions; Word Meaning.** The headings of the Sections of this Agreement are for convenience of reference only, are not to be considered a part hereof, and

shall not limit or otherwise affect any of the terms hereof. Capitalized terms not otherwise defined shall have the meanings defined in the Loan Documents. Words such as "herein", "hereinafter", "hereof" and "hereunder" when used in reference to this Agreement, refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The singular shall include the plural and the masculine sender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. The word "including" shall not be restrictive and shall be interpreted as if followed by the words "without limitation".

      23.    **Severability.**  The invalidity, illegality or unenforceability of any provision of this Agreement, pursuant to judicial decree or otherwise, shall not affect the validity of enforceability of any other provision of this Agreement, each of which shall remain in full force and effect.

      24.    **Entire Agreement; Counterparts; Representation, etc.**  This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior representations, promises, and statements, oral or written, made by the parties with respect thereto. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument. Each of the parties hereto hereby acknowledges that it has been represented by independent counsel of its own choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with the consent and upon the advice of said independent counsel. Each of the parties hereto acknowledges that no other party, or agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter hereof, to induce the other party to execute this Agreement or any of the documents referred to herein, and each party hereto acknowledges that it has not executed this Agreement or such documents in reliance upon any such promise, representation, or warranty not contained herein.

      25.    **Confidentiality**.  The parties shall not disclose the existence or terms of this Agreement, except as required by law or as necessary to enforce the Loan Documents and this Agreement, including as necessary to obtain regulatory approvals for a Closing under Section 7.

      26.    **Construction**.  This Agreement is the product of review and comment by both Lender and Borrower and their respective counsel, and the terms hereof shall not be construed in favor of a non-drafting party. Nothing in this Agreement or any of the Loan Documents or any other agreement between Borrower and Lender or Lender's Assignee should be construed to make Lender or Lender's Assignee a partner of or joint venturer with Borrower in connection with the operation of the Community or the Collateral or for any other purpose. Lender's Assignee is an intended third party beneficiary of this Agreement and will have the right to enforce all the obligations of Obligors herein.

      27.    **CONTROLLING LAW. THE PARTIES HERETO AGREE THAT THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE**

WITH, THE LAWS OF THE STATE OF FLORIDA AND THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN THE STATE OF FLORIDA, FOR THE ENFORCEMENT OF ANY AND ALL OBLIGATIONS UNDER THE LOAN DOCUMENTS EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT IT IS TO BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT SHALL BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION.

28.    **WAIVER OF JURY TRIAL.**    EACH PARTY HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF CAPMARK OR LENDER AND/OR OBLIGORS WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT, OR THE EXERCISE OF A PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT, OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. OBLIGORS AGREE THAT LENDER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF OBLIGORS AND LENDER IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY AS AN INDUCEMENT OF THE PARTIES TO ENTER INTO THEIR RESPECTIVE AGREEMENTS HEREIN, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER (WHETHER OR NOT MODIFIED HEREIN) BETWEEN OBLIGORS AND LENDER SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

29.    **Miscellaneous.**

Time is of the essence of this Agreement.

Any notice, demand or communication required or permitted to be given by this Agreement or the other documents executed in connection herewith by applicable law shall be in writing and shall be deemed received (a) on the date delivered, if sent by hand delivery (to the person or department if one is specified below) with receipt acknowledged by the recipient thereof (b) three (3) Business Days following the date deposited in U.S. mail, certified or registered, with return receipt requested, (c) one (1) Business Day following the date deposited with Federal Express or other national overnight carrier, and in case addressed as follows:

If to Obligors:

        Westport Holdings Tampa, Limited Partnership
        Westport Nursing Tampa, Limited Partnership
        Westport Holdings Tampa II, Limited Partnership
        Westport Senior Living Investment Fund, L.P.
        11360 North Jog Road, Suite 102
        Palm Beach Gardens, Florida  33418
        Attn:  Mr. Lawrence Landry

with a copy to:

        Philip J. Notopoulos, Esquire
        Holland & Knight LLP
        10 St. James Avenue
        Boston, Massachusetts 02116

If to Lender or Lender's Assignee:

        Horizon LP UV Lender, LLC
        5790 Fleet Street, Suite 300
        Carlsbad, California 92008
        Attn:  Ms. Kimberly Hynek

with a copy to:

        Craig A. Taylor, General Counsel
        235 N. Edgeworth Street
        Greensboro, NC 27401

Either party may change its address to another single address by notice given as herein provided, except any change of address notice must be actually received in order to be effective.

In the event this Agreement is terminated as provided herein, the provisions of Sections 2, 3, ,4, 14, 16, 17, 19, and 21, and the last sentence of Section 12.4(b), shall survive such termination.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Obligors and Lender have caused this Agreement to be duly executed as of the date first written above.

**OBLIGORS**:

WESTPORT HOLDINGS TAMPA, LIMITED PARTNERSHIP, a Delaware limited partnership

By:  Westport Holdings University Village, L.L.C., its sole General Partner

By:  Westport Advisors, LTD., its sole Manager

By:  Westport Asset Management, L.L.C., its sole General Partner

By: _____
      Lawrence L. Landry, President

WESTPORT NURSING TAMPA, LIMITED PARTNERSHIP, a Delaware limited partnership

By:  Westport Holdings University Village, L.L.C., its sole General Partner

By:  Westport Advisors, LTD., its sole Manager

By:  Westport Asset Management, L.L.C., its sole General Partner

By: _____
      Lawrence L. Landry, President

WESTPORT HOLDINGS TAMPA II, L.L.C, a Delaware limited liability company

By: _____
      Lawrence L. Landry, President

#25907679_v2

WESTPORT SENIOR LIVING INVESTMENT
FUND, LIMITED PARTNERSHIP, a Delaware
limited partnership

By: Westport Advisors, LTD., its sole Manager

By: Westport Asset Management, L.L.C., its sole
General Partner

By: _____
Lawrence L. Landry, President


**LENDER:**

HORIZON LP UV LENDER, LLC, a Delaware
limited liability company

By: _____
Name: Andrew S. Kohlberg
Title: President

#25907679_v2

List of Exhibits:

| | |
|---|---|
| Exhibit A: | WHT Property Description |
| Exhibit B: | WNT Property Description |
| Exhibit C: | Villas Property Description |
| Exhibit D: | Outstanding Principal Amount |
| Exhibit E: | Operating Budget |
| Exhibit F: | Disclosures Schedule |

#25907679_v2

# EXHIBIT A

## WHT PROPERTY DESCRIPTION

THIS

CERTI                    OPY

### Parcel 2A, also known as Parcel A:

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a Point on the North Right-of-Way of Fowler Avenue (S.R. 582);

thence South 89° 47' 00" East, along said North line a distance of 1,331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1,274.92 (1,274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section;

thence North 00° 07' 13" East, a distance of 1,330.63 (1,330.58) feet to a point on the North line of the Southwest 1/4 of said Section 8;

thence North 89° 56' 41" West, (North 89° 58' 41" West), along the North line a distance of 668.24 (668.43) feet;

thence South 00° 03' 54" East, a distance of 75.59 feet;

thence South 89° 53' 15" West, a distance of 4.50 feet to a POINT OF BEGINNING;

thence South 00° 06' 45" East, a distance of 89.00 feet;

thence South 89° 53' 15" West, a distance of 71.00 feet;

thence South 00° 06' 45" East, a distance of 8.00 feet;

thence North 89° 53' 15" East, a distance of 75.50 feet;

thence South 00° 06' 45" East, a distance of 188.00 feet;

thence South 89° 53' 15" West, a distance of 130.00 feet;

thence North 00° 06' 45" West, a distance of 42.00 feet;

thence South 89° 53' 15" West, a distance of 35.50 feet;

thence North 00° 06' 45" West, a distance of 76.00 feet;

thence North 89° 53' 15" East, a distance of 33.00 feet;

thence North 00° 06' 45" West, a distance of 67.50 feet;

thence North 89° 53' 15" East, a distance of 23.00 feet;

thence North 00° 06' 45" West, a distance of 79.50 feet;

thence North 89° 53' 15" East, a distance of 62.50 feet;

thence North 00° 06' 45" West, a distance of 20.00 feet;

thence North 89° 53' 15" East, a distance of 42.50 feet to the POINT OF BEGINNING.



THIS IS NOT A CERTIFIED COPY

**Parcel 2B, also known as Parcel 2:**

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section 8;

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to a point on the North line of the Southwest 1/4 of Section 8;

thence North 89° 56' 41" West (North 89° 58' 41" West), along the North line a distance of 668.24 (668.43) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 03' 54.2" East (South 00° 06' 45" East), a distance of 525.89 (525.59) feet to a point;

thence North 89° 46' 02" West (North 89° 49' 39" West), a distance of 635.23 (635.57) feet to a point;

thence North 00° 07' 35" East (North 00° 05' 35" East), a distance of 523.92 (523.92) feet to a point on the North line of said Southwest 1/4 of Section 8;

thence South 89° 56' 41" East (South 89° 58' 41" East), along said North line a distance of 633.49 (633.68) feet to the POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM the West 6 feet thereof conveyed to Hillsborough County in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

AND LESS THE FOLLOWING DESCRIBED PARCEL:

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way of Fowler Avenue (S.R. 582);

thence South 89° 47' 00" East, along said North line, a distance of 1,331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East) along said East line a distance of 1,274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section;

thence North 00° 07' 13" East, a distance of 1,330.63 (1,330.58) feet to a point on the North line of the Southwest 1/4 of said Section 8;

THIS IS NOT A
CERTIFIED COPY

thence North 89° 56' 41" West, (North 89° 58' 41" West) along the North line a distance of 668.24 (668.43) feet;

thence South 00° 03' 54" East, a distance of 75.59 feet;

thence South 89° 53' 15" West, a distance of 4.50 feet to a POINT OF BEGINNING;

thence South 00° 06' 45" East, a distance of 89.00 feet;

thence South 89° 53' 15" West, a distance of 71.00 feet;

thence South 00° 06' 45" East, a distance of 8.00 feet;

thence North 89° 53' 15" East, a distance of 75.50 feet;

thence South 00° 06' 45" East, a distance of 188.00 feet;

thence South 89° 53' 15" West, a distance of 130.00 feet;

thence North 00° 06' 45" West, a distance of 42.00 feet;

thence South 89° 53' 15" West, a distance of 35.50 feet;

thence North 00° 06' 45" West, a distance of 76.00 feet;

thence North 89° 53' 15" East, a distance of 33.00 feet;

thence North 00° 06' 45" West, a distance of 67.50 feet;

thence North 89° 53' 15" East, a distance of 23.00 feet;

thence North 00° 06' 45" West, a distance of 79.50 feet;

thence North 89° 53' 15" East, a distance of 62.50 feet;

thence North 00° 06' 45" West, a distance of 20.00 feet;

thence North 89° 53' 15" East, a distance of 42.50 feet to the POINT OF BEGINNING.

Note:  Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, Public Records of Hillsborough County, Florida.

## Parcel 3:

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 south, Range 19 East, Hillsborough County, Florida, described as follows;

From the Southwest corner of said Section 8, run North 00° 08' 00" East, along the West boundary of said Southwest 1/4 of Section 8, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of the Southwest 1/4 of the Southwest 1/4 of said Section 8;

THIS IS NOT A
[LATER FILED COPY]

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 07' 13" West (South 00° 04' 28" West), along said East line a distance of 100.00 (99.97) feet to a point;

thence South 36° 21' 40" West (South 36° 21' 32" West), a distance of 455.56 (455.56) feet to a point;

thence North 89° 46' 02" West (North 89° 46' 29" West), a distance of 337.11 (337.11) feet to a point;

thence South 45° 13' 58" West (South 45° 07' 48" West), a distance of 84.85 (84.78) feet to a point;

thence North 00° 03' 54.2" West (North 00° 06' 45" West), a distance of 525.89 (525.59) feet to a point on the North line of the Northwest 1/4 of the Southwest 1/4 of Section 8;

thence South 89° 56' 41" East (South 89° 58' 41" East), along said North line a distance of 668.24 (668.43) feet to the POINT OF BEGINNING.

Note:   Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, Public Records of Hillsborough County, Florida.

TOGETHER WITH non-exclusive Easement rights as set forth in the Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 5832, Page 1191; as affected by First Amendment to Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 6129, Page 1653, both of the Public Records of Hillsborough County, Florida.

## Parcel 4:

The South 100 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as Parcel 101, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:

The East 20 feet of the South 100 feet of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

## Parcel 5:

The North 200 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as a portion of Parcel 100, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:



The East 20 feet of the North 200 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 6:

The South 100.0 feet of the North 200.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 7:

The North 100.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 8:

The South 80 feet of the North 200 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 9:

The North 60 feet of the South 140 feet of the North 200 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 10:

The South 100 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

### Parcel 11:

The South 200 feet of the East 1/2 of Lot 6, LESS the East 196 feet of the North 100 feet thereof, AND LESS the East 6 feet of the South 100 feet thereof, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as a portion of Parcel 100, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:

The East 14 feet of the South 200 feet of the East 1/2 of Lot 6, LESS the East 196 feet of the North 100 feet thereof, AND LESS the East 6 feet of the South 100 feet thereof, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

THIS IS NOT A
CERTIFIED COPY

**Parcel 12:**

The North 60 feet of the West 303 feet of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 13:**

The North 300 feet of the East 106.2 feet of the West 256.2 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 14:**

The West 303 feet of the South 70 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

TOGETHER WITH:

Commence at the Northwest corner of Lot 5, HANKINS ACRES, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida, thence S 00°01'23" W, 300.00 feet to the Point of Beginning; thence S 89°53'31" E, 256.13 feet; thence S 00°02'12" W, 1.33 feet; thence N 89°47'11" W, 256.13 feet; thence N 00°01'23" E, 0.86 feet to the Point of Beginning.

**Parcel 15:**

The North 300 feet of the West 150 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 16:**

The South 100 feet of the East 1/2 of Lot 2, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 17:**

The East 1/2 of Lot 3, LESS the South 100.00 feet, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

F:\DOCS\Robin\2667.42 Westport.Hillsborough County\Legal Descriptions\Westport Holdings and Villas.wpd



EXHIBIT B

WNT PROPERTY DESCRIPTION

**Parcel 2A, also known as Parcel A:**

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a Point on the North Right-of-Way of Fowler Avenue (S.R. 582);

thence South 89° 47' 00" East, along said North line a distance of 1,331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1,274.92 (1,274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section;

thence North 00° 07' 13" East, a distance of 1,330.63 (1,330.58) feet to a point on the North line of the Southwest 1/4 of said Section 8;

thence North 89° 56' 41" West, (North 89° 58' 41" West), along the North line a distance of 668.24 (668.43) feet;

thence South 00° 03' 54" East, a distance of 75.59 feet;

thence South 89° 53' 15" West, a distance of 4.50 feet to a POINT OF BEGINNING;

thence South 00° 06' 45" East, a distance of 89.00 feet;

thence South 89° 53' 15" West, a distance of 71.00 feet;

thence South 00° 06' 45" East, a distance of 8.00 feet;

thence North 89° 53' 15" East, a distance of 75.50 feet;

thence South 00° 06' 45" East, a distance of 188.00 feet;

thence South 89° 53' 15" West, a distance of 130.00 feet;

thence North 00° 06' 45" West, a distance of 42.00 feet;

thence South 89° 53' 15" West, a distance of 35.50 feet;

thence North 00° 06' 45" West, a distance of 76.00 feet;

thence North 89° 53' 15" East, a distance of 33.00 feet;

thence North 00° 06' 45" West, a distance of 67.50 feet;

thence North 89° 53' 15" East, a distance of 23.00 feet;

thence North 00° 06' 45" West, a distance of 79.50 feet;

thence North 89° 53' 15" East, a distance of 62.50 feet;

thence North 00° 06' 45" West, a distance of 20.00 feet;

thence North 89° 53' 15" East, a distance of 42.50 feet to the POINT OF BEGINNING.

**Parcel 2B, also known as Parcel 2:**

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section 8;

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to a point on the North line of the Southwest 1/4 of Section 8;

thence North 89° 56' 41" West (North 89° 58' 41" West), along the North line a distance of 668.24 (668.43) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 03' 54.2" East (South 00° 06' 45" East), a distance of 525.89 (525.59) feet to a point;

thence North 89° 46' 02" West (North 89° 49' 39" West), a distance of 635.23 (635.57) feet to a point;

thence North 00° 07' 35" East (North 00° 05' 35" East), a distance of 523.92 (523.92) feet to a point on the North line of said Southwest 1/4 of Section 8;

thence South 89° 56' 41" East (South 89° 58' 41" East), along said North line a distance of 633.49 (633.68) feet to the POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM the West 6 feet thereof conveyed to Hillsborough County in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

AND LESS THE FOLLOWING DESCRIBED PARCEL:

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way of Fowler Avenue (S.R. 582);

thence South 89° 47' 00" East, along said North line, a distance of 1,331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East) along said East line a distance of 1,274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section;

thence North 00° 07' 13" East, a distance of 1,330.63 (1,330.58) feet to a point on the North line of the Southwest 1/4 of said Section 8;

thence North 89° 56' 41" West, (North 89° 58' 41" West), along the North line a distance of 668.24 (668.43) feet;

thence South 00° 03' 54" East, a distance of 75.59 feet;

thence South 89° 53' 15" West, a distance of 4.50 feet to a POINT OF BEGINNING;

thence South 00° 06' 45" East, a distance of 89.00 feet;

thence South 89° 53' 15" West, a distance of 71.00 feet;

thence South 00° 06' 45" East, a distance of 8.00 feet;

thence North 89° 53' 15" East, a distance of 75.50 feet;

thence South 00° 06' 45" East, a distance of 188.00 feet;

thence South 89° 53' 15" West, a distance of 130.00 feet;

thence North 00° 06' 45" West, a distance of 42.00 feet;

thence South 89° 53' 15" West, a distance of 35.50 feet;

thence North 00° 06' 45" West, a distance of 76.00 feet;

thence North 89° 53' 15" East, a distance of 33.00 feet;

thence North 00° 06' 45" West, a distance of 67.50 feet;

thence North 89° 53' 15" East, a distance of 23.00 feet;

thence North 00° 06' 45" West, a distance of 79.50 feet;

thence North 89° 53' 15" East, a distance of 62.50 feet;

thence North 00° 06' 45" West, a distance of 20.00 feet;

thence North 89° 53' 15" East, a distance of 42.50 feet to the POINT OF BEGINNING.

Note:    Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, Public Records of Hillsborough County, Florida.

## Parcel 3:

A parcel consisting of part of the Southwest 1/4 of Section 8, Township 28 south, Range 19 East, Hillsborough County, Florida, described as follows;

From the Southwest corner of said Section 8, run North 00° 08' 00" East, along the West boundary of said Southwest 1/4 of Section 8, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of the Southwest 1/4 of the Southwest 1/4 of said Section 8;

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 07' 13" West (South 00° 04' 28" West), along said East line a distance of 100.00 (99.97) feet to a point;

thence South 36° 21' 40" West (South 36° 21' 32" West), a distance of 455.56 (455.56) feet to a point;

thence North 89° 46' 02" West (North 89° 46' 29" West), a distance of 337.11 (337.11) feet to a point;

thence South 45° 13' 58" West (South 45° 07' 48" West), a distance of 84.85 (84.78) feet to a point;

thence North 00° 03' 54.2" West (North 00° 06' 45" West), a distance of 525.89 (525.59) feet to a point on the North line of the Northwest 1/4 of the Southwest 1/4 of Section 8;

thence South 89° 56' 41" East (South 89° 58' 41" East), along said North line a distance of 668.24 (668.43) feet to the POINT OF BEGINNING.

Note:    Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, Public Records of Hillsborough County, Florida.

TOGETHER WITH non-exclusive Easement rights as set forth in the Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 5832, Page 1191; as affected by First Amendment to Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 6129, Page 1653, both of the Public Records of Hillsborough County, Florida.

F:\DOCS\Robin\2667.42 Westport.Hillsborough County\Legal Descriptions\Westport Holdings Property.wpd

EXHIBIT C

VILLAS PROPERTY DESCRIPTION

**Parcel 4:**

The South 100 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as Parcel 101, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:

The East 20 feet of the South 100 feet of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 5:**

The North 200 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as a portion of Parcel 100, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:

The East 20 feet of the North 200 feet of the East 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 6:**

The South 100.0 feet of the North 200.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 7:**

The North 100.0 feet of the West 1/2 of Lot 7, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 8:**

The South 80 feet of the North 200 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 9:**

The North 60 feet of the South 140 feet of the North 200 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 10:**

The South 100 feet of the West 1/2 of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 11:**

The South 200 feet of the East 1/2 of Lot 6, LESS the East 196 feet of the North 100 feet thereof, AND LESS the East 6 feet of the South 100 feet thereof, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM:

That parcel of land known as a portion of Parcel 100, as conveyed to Hillsborough County by Warranty Deed recorded in Official Records Book 16586, Page 722, of the Public Records of Hillsborough County, Florida, being more particularly described as follows:

The East 14 feet of the South 200 feet of the East 1/2 of Lot 6, LESS the East 196 feet of the North 100 feet thereof, AND LESS the East 6 feet of the South 100 feet thereof, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 12:**

The North 60 feet of the West 303 feet of Lot 6, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 13:**

The North 300 feet of the East 106.2 feet of the West 256.2 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 14:**

The West 303 feet of the South 70 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

TOGETHER WITH:

Commence at the Northwest corner of Lot 5, HANKINS ACRES, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida, thence S 00°01'23" W, 300.00 feet to the Point of Beginning; thence S 89°53'31" E, 256.13 feet; thence S 00°02'12" W, 1.33 feet; thence N 89°47'11" W, 256.13 feet; thence N 00°01'23" E, 0.86 feet to the Point of Beginning.

## Parcel 15:

The North 300 feet of the West 150 feet of Lot 5, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

## Parcel 16:

The South 100 feet of the East 1/2 of Lot 2, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

## Parcel 17:

The East 1/2 of Lot 3, LESS the South 100.00 feet, HANKINS ACRES, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

F:\DOCS\Robin\2667.42 Westport.Hillsborough County\Legal Descriptions\Villas Property.wpd

EXHIBIT D
OUTSTANDING PRINCIPAL AMOUNT

Loan A:     $12,261,264.29
Loan B:     $ 7,814,464.30

EXHIBIT E
OPERATING BUDGET

### University Village Campus Income Summary - 2013

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Budget Income Statement** | | | | | | | | | | | | | |
| **Operating Revenues** | | | | | | | | | | | | | |
| Monthly Service Fees | 958,477 | 958,633 | 958,154 | 957,676 | 957,237 | 958,699 | 958,653 | 956,668 | 956,824 | 956,818 | 954,833 | 954,989 | 11,487,663 |
| Monthly Service Fee Credits | (161,515) | (172,432) | (181,391) | (192,808) | (204,637) | (204,759) | (203,056) | (200,738) | (204,628) | (200,864) | (200,336) | (210,261) | (2,327,425) |
| Rental Income | 43,041 | 47,076 | 51,111 | 55,146 | 57,836 | 61,871 | 67,251 | 72,651 | 76,667 | 80,702 | 86,082 | 60,117 | 789,531 |
| Other Revenue | 29,797 | 28,497 | 29,187 | 29,687 | 29,775 | 29,110 | 28,838 | 28,826 | 29,026 | 29,054 | 30,389 | 37,689 | 359,873 |
| **Subtotal - Operating Revenues** | **869,800** | **861,774** | **857,061** | **849,701** | **840,211** | **844,920** | **851,687** | **857,388** | **857,889** | **865,710** | **870,968** | **882,533** | **10,309,642** |
| | | | | | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | | | | | |
| Administrative Services | 149,230 | 142,859 | 146,420 | 145,456 | 146,315 | 146,076 | 149,412 | 148,595 | 145,958 | 152,269 | 146,286 | 166,029 | 1,784,906 |
| Dining Services | 163,702 | 146,857 | 160,584 | 155,170 | 160,195 | 156,181 | 161,455 | 161,927 | 157,059 | 162,331 | 157,705 | 162,795 | 1,905,960 |
| Grounds Maintenance Services | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 5,775 | 69,300 |
| Housekeeping Services | 50,651 | 45,871 | 50,355 | 48,674 | 48,854 | 48,274 | 49,716 | 49,727 | 48,273 | 49,716 | 48,339 | 50,091 | 588,541 |
| Laundry | 6,818 | 6,299 | 6,758 | 6,605 | 6,755 | 6,627 | 6,693 | 6,605 | 6,626 | 6,605 | 6,545 | 6,777 | 79,896 |
| Lifestyles | 30,702 | 29,304 | 29,802 | 29,195 | 30,185 | 28,554 | 29,735 | 29,292 | 29,507 | 30,581 | 28,788 | 41,393 | 367,036 |
| Nursing Services | 18,633 | 16,677 | 18,005 | 17,229 | 17,981 | 17,618 | 18,202 | 18,202 | 17,798 | 18,202 | 17,618 | 18,202 | 214,368 |
| Building Maintenance Services | 69,873 | 66,807 | 69,596 | 68,608 | 68,328 | 73,046 | 73,385 | 74,382 | 67,822 | 70,015 | 68,932 | 70,157 | 840,951 |
| Emergency System Services | 33,089 | 29,355 | 32,573 | 30,760 | 31,097 | 31,112 | 32,233 | 32,053 | 31,022 | 32,053 | 31,022 | 32,053 | 378,223 |
| Social Services | 5,177 | 4,664 | 4,949 | 4,789 | 4,949 | 4,789 | 4,949 | 4,949 | 4,933 | 5,097 | 4,933 | 5,097 | 59,277 |
| Transportation Services | 23,660 | 21,859 | 23,829 | 22,694 | 22,883 | 22,825 | 23,424 | 23,419 | 22,633 | 23,424 | 22,825 | 23,424 | 276,902 |
| Bad Debt Expense | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 300,000 |
| **Subtotal - Operations Expense** | **582,309** | **541,330** | **573,445** | **559,956** | **568,316** | **565,878** | **579,982** | **580,016** | **562,405** | **581,159** | **563,568** | **606,795** | **6,865,360** |
| | | | | | | | | | | | | | |
| **Operating Margin Bef. Other Oper. Exp** | **287,491** | **320,444** | **283,615** | **289,745** | **271,894** | **279,042** | **271,705** | **277,371** | **295,484** | **284,550** | **307,201** | **275,738** | **3,444,282** |
| | | | | | | | | | | | | | |
| **Other Operating Expenses:** | | | | | | | | | | | | | |
| Marketing | 134,048 | 92,317 | 122,625 | 115,157 | 99,590 | 94,150 | 104,636 | 102,888 | 107,690 | 101,071 | 93,183 | 89,408 | 1,256,763 |
| Nursing and AL Free Days | 25,250 | 25,250 | 93,250 | 25,250 | 25,250 | 93,250 | 25,000 | 24,750 | 92,750 | 24,500 | 24,250 | 92,250 | 571,000 |
| Utilities | 73,564 | 75,628 | 86,141 | 81,162 | 85,902 | 100,331 | 99,476 | 106,433 | 98,152 | 88,412 | 87,654 | 88,117 | 1,070,971 |
| Taxes | 46,834 | 46,834 | 46,834 | 46,834 | 47,434 | 46,834 | 46,834 | 46,834 | 46,834 | 46,834 | 46,834 | 46,834 | 562,608 |
| Insurance | 45,861 | 47,151 | 47,151 | 47,151 | 47,151 | 47,151 | 47,151 | 47,230 | 47,237 | 47,237 | 47,237 | 47,237 | 564,943 |
| Liability & Umbrella Insurance | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,504 | 12,879 | 12,879 | 150,798 |
| Management Fees and Related | 34,792 | 34,471 | 34,282 | 33,988 | 33,608 | 33,797 | 34,067 | 34,296 | 34,316 | 34,628 | 34,839 | 35,301 | 412,386 |
| Other - Inv. Fees, Owner/Mgmt Trav | | | | | | | | | | | | | |
| **Subtotal - Operating Expenses** | **372,853** | **334,155** | **442,787** | **362,045** | **351,439** | **428,016** | **369,668** | **374,935** | **439,482** | **355,186** | **346,875** | **412,027** | **4,589,469** |
| | | | | | | | | | | | | | |
| **Operating Margin** | **(85,362)** | **(13,711)** | **(159,172)** | **(72,300)** | **(79,545)** | **(148,974)** | **(97,963)** | **(97,564)** | **(143,999)** | **(70,635)** | **(39,675)** | **(136,288)** | **(1,145,187)** |
| | | | | | | | | | | | | | |
| **Net Entrance Fees** | | | | | | | | | | | | | |
| Entrance Fees Received | 518,206 | 499,342 | 499,342 | 499,342 | 499,342 | 643,041 | 499,342 | 499,342 | 643,041 | 499,342 | 499,342 | 643,041 | 6,442,062 |
| Community Fee (Non refundable) | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 7,916.67 | 95,000 |
| Entrance Fees Refunded | (348,333) | (348,333) | (348,333) | (438,333) | (348,333) | (348,333) | (348,333) | (438,333) | (348,333) | (348,333) | (348,333) | (348,333) | (4,360,000) |
| PIP Refunded | | | | | | | | | | | | | |
| PIP Deposits | | | | | | | | | | | | | |
| **Subtotal - Net Entrance Fees** | **177,789** | **158,925** | **158,925** | **68,925** | **158,925** | **302,625** | **158,925** | **68,925** | **302,625** | **158,925** | **158,925** | **302,625** | **2,177,062** |
| | | | | | | | | | | | | | |
| **Other Revenue and Expenses** | | | | | | | | | | | | | |
| Investment Income | 401 | 403 | 405 | 407 | 409 | 411 | 413 | 415 | 417 | 419 | 421 | 423 | 4,945 |
| Gain/Loss on Non-Investments | | | | | | | | | | | | | |
| Other Financing Related Expenses | (35,938) | (35,931) | (35,923) | (35,916) | (37,409) | (35,901) | (35,894) | (35,886) | (35,871) | (35,864) | (43,521) | (432,267) |
| Lease Income (Health Center) | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,200,000 |
| **Subtotal - Other Rev & Exp** | **64,463** | **64,473** | **64,482** | **64,491** | **63,001** | **64,510** | **64,519** | **64,529** | **64,538** | **64,548** | **64,557** | **64,902** | **772,678** |
| | | | | | | | | | | | | | |
| **Cash Coverage Numerator** | **156,890** | **209,686** | **64,235** | **61,116** | **142,381** | **218,161** | **125,482** | **35,890** | **223,164** | **152,838** | **183,808** | **230,903** | **1,804,553** |
| | | | | | | | | | | | | | |
| Capmark Interest | (45,226) | (45,072) | (44,919) | (44,765) | (44,610) | (44,456) | (44,301) | (44,146) | (43,834) | (43,678) | (43,521) | (532,516) |
| Capmark Principal | (70,204) | (70,357) | (70,511) | (70,664) | (70,819) | (70,973) | (71,128) | (71,284) | (71,439) | (71,595) | (71,752) | (71,908) | (852,634) |
| | | | | | | | | | | | | | |
| **Cash Coverage Denominator** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(115,429)** | **(1,385,150)** |
| | | | | | | | | | | | | | |
| **Cash Coverage Ratio** | **1.36** | **1.82** | **0.56** | **0.53** | **1.23** | **1.89** | **1.09** | **0.31** | **1.93** | **1.32** | **1.59** | **2.00** | **1.30** |
| | | | | | | | | | | | | | |
| **Available Cash after Capmark pmt** | | | | | | | | | | | | | **419,403** |
| | | | | | | | | | | | | | |
| Capital Improvements | | | | | | | | | | | | | (500,000) |
| Remodel Units | | | | | | | | | | | | | (557,500) |
| Other Principal payments | | | | | | | | | | | | | (99,400) |
| | | | | | | | | | | | | | |
| **Available Cash after Capitals** | | | | | | | | | | | | | **(737,497)** |
| Accumulative cash balance | | | | | | | | | | | | | **(737,497)** |
| | | | | | | | | | | | | | |
| **Move Ins** | | | | | | | | | | | | | **70** |
| | | | | | | | | | | | | | |
| **Move Outs** | | | | | | | | | | | | | **57** |
| | | | | | | | | | | | | | |
| Ending IL Occupied Units | 302.5 | 303.0 | 304.0 | 305.0 | 305.5 | 305.5 | 308.0 | 309.5 | 310.0 | 311.0 | 312.5 | 313.0 | 313 |
| Average Total Occupied Units | 302.5 | 303.0 | 304.0 | 305.0 | 305.5 | 306.5 | 308.0 | 309.5 | 310.0 | 311.0 | 312.5 | 313.0 | 308 |
| Ending VL Occupied Units | 40.5 | 41.0 | 41.0 | 41.0 | 41.5 | 41.5 | 41.5 | 41.0 | 41.5 | 41.5 | 41.0 | 41.5 | 42 |
| % Average Total Occupancy | 69.7% | 69.9% | 70.1% | 70.3% | 70.4% | 70.7% | 71.0% | 71.2% | 71.4% | 71.6% | 71.8% | 72.1% | 72.2% |

EXHIBIT F
DISCLOSURES

**List of Contracts Requiring Payments to Affiliates of Borrower**

1. Management Services Agreement between Borrower and Agewell Senior Living Management LP dated February1, 2010 as amended by letter dated July 31, 2013 changing name of Owner's Representative to Lawrence L. Landry.

2. Memorandum agreement dated August 2, 2013 between Borrower and Agewell for consulting with regard to the Health Center, consulting services to be provided by David Mills.

3. Confidentiality and License Agreement between Borrower and Masterpiece Living, LLC dated August 1, 2010 to be renewed effective Oct. 1, 2013 at 6% increase.

#25907679_v2

Westport Holdings Tampa, LP
Loan Extension Agreement
Exhibit F - Disclosure Schedule

| Agreement # | Disclosure |
|---|---|
| 15.5 | None |
| 15.6 | None |
| 15.7 | See attached list of contracts |
| 15.9 | None |
| 15.10 | Health Center Lease - termination fee of $75k |
| 15.11 | None |
| 15.13 | None |
| 15.14 | None |
| 15.16 | None |
| 15.18 | None |

**Westport Holdings Tampa, LP**
**Lifecare Roll**
**as of September 30, 2013**

| Location 1st Person Apt # | Location 2nd Person Apt # | Last Name | First Name (1) | First Name (2) |
|---|---|---|---|---|
| **Retirement Center** | | | | |
| E603 | E603 | ABRAHAM | VATTATHIL | ALEYAMMA |
| G304 | | ADCOX | MILDRED | |
| A704 | | ADEL | SEYMOUR | |
| F302 | F302 | AGNEW | HERBERT | MOLLIE |
| E703 | | ALDERMAN | KENNETH | |
| G704 | G704 | ALEXANDER | RICHARD | LUELLA |
| C405 | | ALFONSO | REGLA | |
| C304 | | ALLEN | DOROTHY | |
| F605 | AL 264 | ALLEN | PAUL | MARGA |
| G202 | | ALLEN | VIRGINIA (MURRIEL) | |
| H103 | | ALLENSWORTH | TOM | |
| B106 | | ALVAREZ | SARA | |
| A107 | | ANGELO | WALLACE | |
| B601 | | ATHERTON | JOYCE | |
| D607 | NC 153W | BALE / EKERN | DORIS | ROY |
| G603 | | BALLARD | DARRELL | ELIZABETH |
| F404 | | BARRETT | GORDON | |
| E706 | | BARTLETT | GEORGE | ANN |
| H301 | | BARTZ | WILLIAM | |
| D211 | D211 | BATES | JOHN | ELLEN (KAY) |
| C202 | | BAUER | EVELYN | |
| A305 | | BEATIE | IRIS | |
| E102 | E102 | BEHREND | DEAN | SANDRA |
| A602 | A-602 | BELL | RHUDY | JANET |
| G703 | G703 | BISHOP | WILLIAM | MYRA |
| C711 | C-711 | BLAKE | ERNEST | JUDITH |
| A205 | A-205 | BOULT | JOHN | JIMMY LOU |
| C412 | | BOWYER | ARCHIBALD | |
| A301 | | BOZE | MARY | |
| D110 | | BROOKS | EVANGELINE | |
| B501 | | BROOME | BASIL | BEVERLY |
| B709 | | BROWN | MARY LOU | |
| C303 | | BROWN | LEONARD | |
| D302 | | BRUSS | JAMES | |
| B405 | | BURKE | LITA | |
| B604 | | BURNS | MARGARET | |

| | | | | |
|---|---|---|---|---|
| F406 | F406 | BURRUS | RAY | ELEANOR |
| H501 | H501 | BURYCH | JOHN | MARY ELLEN |
| G302 | G-302 | BUSCEMA | SALVATORE | MARY |
| B710 | | CAMPBELL | RACHEL | |
| D707 | | CANADY | RUTH | |
| A102 | AL 254 | CANNIFF | CHARLES | MARGARET |
| D208 | | CAPPEL | ANNE | |
| C607 | | CASTOR | MARY | |
| D206 | | CATANIA | ADRIENNE | |
| B610 | | CHALUPA | GEORGIA ANN | |
| E303 | E-303 | CHERNOFF | JACK | EDITH |
| H403 | | CHIRIKOS | LINDA | |
| H303 | H303 | CHRISTISON | JAMES | JOYCE |
| B609 | B609 | CLARK | DONALD | BARBARA |
| G604 | G-604 | CLARK | HUGH | RUTH |
| H104 | | CLARK | RICHARD | |
| A409 | | CLOYED | KEITH | LEOTA |
| F106 | | COHEN | SHARI | |
| G403 | | COLE | ALICE | |
| C705 | | COMPHER | LOUISE | |
| C503 | | COOK | REBA | |
| E501 | | COOK | ANN | |
| F102 | | COUCH | HELEN | |
| B401 | | CROSS | ELSIE DEANA | |
| A402 | | CROWDER | ANGELA | |
| B701 | | CRUMPTON | FRANKIE | |
| C407 | | CZAJA | MARY | |
| C706 | C706 | DAVIS | RICHARD | MARTHA |
| E506 | | DAVIS | MARY DEAN | |
| D608 | | DEHART | EARL | PATRICIA |
| C112 | C112 | DELAP | OREIN | MARIANNE |
| C212 | | DENICOURT | RAYMOND | |
| A303 | | DOYLE | ANTONIETTE | |
| F701 | F701 | DUBOSE | PAUL | INGRID |
| D604 | | DURDEN | ROBERT | |
| F202 | | DURFEE | HAZEL | |
| C302 | | EDMISTER | MELLICENT | |
| D311 | D-311 | EDMISTON / VINCENT | JAMES | CHARLOTTE |
| D304 | | EGLE | MARION | |
| G601 | | ERNST | ROGER | |
| D611 | | EUBANKS | JUANITA | |
| E704 | | FEDERICO | BARBARA | |
| H102 | | FERRY | ROBERT | JEAN |
| D106 | | FISHER | AENID | |
| E104 | E104 | FLACKMAN | MARTIN | JUTTA |
| A504 | | FLECHA | MARIA | |

| | | | | |
|---|---|---|---|---|
| D612 | | FLYNN | MARY | |
| G104 | | FORDYCE | MARGARET | |
| A206 | | FRANK | CECELIA | |
| A606 | A606 | FREEMAN | RICHARD | LENORE |
| C709 | | FRENCH | NORMA | |
| E304 | | FRITTS | CLOYCE | |
| H202 | | FULFORD | ELEANOR | |
| A106 | A106 | FURMAN | CHARLES | ZOE |
| E103 | | GANIO | FILOMENA | |
| A308 | | GARBER | BARBARA | |
| E206 | | GLASS | MARTHA | |
| A109 | | GREENSLADE | PEGGY | |
| A405 | | GREENSPAN | BERNICE | |
| H503 | | GREENWOOD | VIRGINIA | |
| G201 | | GRIMES | BOB | |
| D102 | | GUARINO | VINCENT | |
| D109 | | HALE | DOLORES | |
| D609 | | HALE | DIXONIA | |
| G501 | | HALE | CAROL | |
| B409 | B409 | HALL | JOHN | |
| D705 | D705 | HALLGREN | JOHN | DORIS |
| A604 | | HAMILTON | RITA | |
| C401 | C-401 | HAMRICK | JACK | BETTY |
| F402 | | HARRELL | JEAN | |
| E201 | | HARRISBERGER | LEE | |
| C603 | | HARTEN | MARGARET | |
| H603 | | HARTLEY | DORIS | |
| E403 | | HAWKER | JEAN | |
| F705 | F705 | HEDLUND | RICHARD | JOAN |
| C101 | | HELLER | FRANCES | |
| D711 | D-711 | HELLER | JACK | JUDITH |
| A607 | | HEMANS | YOLANDA | |
| B404 | | HENNING | VIRGINIA | |
| A410 | | HENRY | DAVID | LORAGHNE |
| E301 | NC 145D | HERSH | ROSALIE | SOLOMON |
| B307 | | HINTON | ETHEL | |
| A210 | | HOBBS | RUSSELL | ELFRIEDE |
| B403 | | HOEYMANS | ROSALEEN | |
| B303 | | HOLLANDER | MARGARET | |
| E606 | | HORNSBY | RICHARD | BARBARA |
| F505 | | HOUSMAN | MILDRED | |
| E401 | | HUFFER | NANCY | |
| A108 | | HUG | WILLIAM | |
| A202 | | HUGHES | BESSIE | |
| E204 | | HUGHES | CHARLES | |
| H701 | | HYMES | BEATRICE | |
| C203 | | IRWIN | GLADYS | |
| D712 | | JAMIR | HAZEL | |

| F305 | F305 | JEFFREY | JAMES | BARBARA |
|------|------|---------|-------|---------|
| E701 | E701 | JENKINS | CHARLES | MONICA |
| B202 | | JENNINGS | JULIA | |
| B201 | | JOHNSON | DENIS | |
| G402 | | JOHNSON | LILLIE | |
| C307 | | JONES | DON | |
| D505 | | JONES | MARJORIE | |
| C710 | | JURY | RUTH | |
| C108 | | KAMEN | BERNICE | |
| D503 | | KARZENSKI | AUDREY | |
| G101 | G-101 | KASS | BEVERLY | SOLOMON |
| D708 | | KASTENBEIN | LUCY | |
| A701 | | KIRKMAN | FRANCES | |
| C501 | | KIRSCHNER | JOYCE | |
| D210 | | KLAUS | MARY | |
| B508 | | KLEIN | RUTH | |
| C507 | | KLEIN | EDITH | |
| F601 | | KLINGHAMER | MARCELINE | |
| B102 | | KLUG | JAUANITA | |
| A610 | | KNOX | MARY KATHLEEN | |
| E106 | E106 | KOTECHA | KEN | KATY |
| D308 | | KOVACH | MARY | |
| H604 | | KRAAI | MARGARET | |
| A104 | | KRAMER | SONIA | |
| C502 | C502 | KRAMER | FREDERICK | ADELAIDE |
| B101 | B-101 | LANEY | JOEL | CAROLYN |
| C403 | | LATHAM | PHYLLIS | |
| L101 | L101 | LEEP | ROY | JANE |
| C610 | | LEHRER | SANDRA | |
| C111 | | LOEWE | BARBARA | |
| A103 | | LOMBARDO | LYDIA | |
| B502 | | LOVE | FRANK | |
| E302 | E-302 | MACEWEN | DOUGLAS | ALVENA |
| E505 | | MAGISON | DIXIE | |
| D605 | | MARIN | ROSELYN | |
| H602 | | MASON | CLARA | |
| A404 | | MATHENY | BARBARA | |
| C207 | | MATTHEW | DOROTHY | |
| G503 | G503 | MAZUR | JOSEPH | LOIS |
| C708 | | MCCLEAN | EVELINE | |
| E604 | | MCCULLERS | MILDRED | |
| C707 | C707 | MCGILL | KENNETH | FRANCES |
| A310 | A310 | MCILVAINE | LINDEN | BEVERLY |
| E402 | | MCKITRICK | YVONNE | |
| D507 | | MCLAUGHLIN | DORIS | |
| H101 | | MCSWEENEY | EUGENE | |

| | | | | |
|---|---|---|---|---|
| D701 | | MELVIN | ROBERT | |
| H601 | H601 | MENENDEZ/BURTOFT | CARYL | |
| F306 | | MEO | ANTHONY | |
| E504 | | MEYER-WALLACE | PHYLLIS | |
| A307 | | MILLER | ELSA | |
| F502 | F-502 | MILLER | EARL | GOLDIE |
| H502 | | MILLER | STEPHEN | |
| A609 | | MILROY | AMELITA | |
| F604 | F604 | MISKUF | RAYMOND | MARIE |
| C404 | | MITCHELL | LILLIE | |
| F206 | | MOFFETT | BEVERLY | |
| C504 | | MONACO | SUSIE | |
| D104 | | MONTONYE | DORATHY | |
| C611 | C-611 | MOON | RICHARD | FRANCES |
| B602 | | MOREDA | IRENE | |
| A505 | | MOSTELLER | GORDON | EMMA |
| G301 | G-301 | NESMAN | EDGAR | MARJORIE |
| A509 | | NEUMEISTER | LESLIE | |
| H702 | | NEWTON | MARGARET | |
| F201 | | NOTT | FRANCES | |
| C409 | | OLIVER | SUSAN | |
| C612 | | ORANDER | ASBILL (RANDY) | |
| D309 | | ORING | STANLEY | |
| D601 | | OSTERMAN | DORIS | |
| B702 | | OWEN | DON | |
| A110 | AL 266 | PARRISH | SADIE | HERBERT |
| D112 | D112 | PATTERSON | GERALD EUGENE | GRACE |
| A101 | | PENNY | STELLA | |
| G102 | | PEREZ | LENORA | |
| A302 | | PETERSON | MARGE | |
| H703 | H703 | PETRONE | JIM | RETTA |
| D401 | | PETTINE | ELIZABETH | |
| C208 | | PIETZ | ELSIE | |
| D204 | | POST | ROBERT | |
| B306 | | PREMO | INEZ | |
| C201 | | PUSATERI | ANGELA | |
| A208 | | RARDIN | VORIS | |
| L102 | | REED | JANE | |
| A709 | | RENDALL | IRENE | |
| C105 | | RHOADS | JOAN | |
| C605 | | RICHARDSON | JANE | |
| D203 | | RICHARDSON | MARY JENE | |
| E105 | E105 | RIEKER | DAVID | MARY |
| E404 | | RIVERS-NICHOLSON | JANE | |
| D508 | | ROBINSON | JACK | |

| | | | | |
|---|---|---|---|---|
| E605 | E605 | ROBINSON | VALDA | CHASE |
| B205 | | ROGNES | RAY | LORETTA |
| A708 | | ROSEN | FRANK | |
| D511 | NC 141D | ROSS | AMY | ARTHUR |
| G203 | | ROSS | JACK | |
| A309 | | ROTHBAUM | MURIEL | |
| D706 | D-706 | SAMUELSON | DERRICK | DIANA |
| B503 | | SANTIAGO | MONSERRRATE | |
| G103 | G103 | SAPPENFIELD | DALE | NANCY |
| C103 | | SCHMEER | E. MARY | |
| G502 | | SCHNEIDER | GISELA | |
| A304 | | SCHWARTZ | THOMAS | |
| A506 | A506 | SCOTT | EDWIN | ANNA |
| F602 | | SENIOR | BEATRICE | |
| C508 | | SESSUMS | TERRELL | |
| E602 | | SHAPIRO | EDYTHE | |
| E503 | | SHARP | DORIS | |
| F702 | F-702 | SHEAR | LEE | LINDA |
| D107 | D107 | SHIPHERD | JOHN | JOYCE |
| H203 | | SHIPMAN | DONALD | |
| F606 | F-606 | SHIVELY | JOHN | LOIS |
| B703 | | SHOKES | ARLENE | |
| D103 | | SICARDO | GAIL | |
| G504 | G-504 | SICKLES | WALTER | JANET |
| F101 | | SIDES | MILDRED | |
| H404 | H404 | SIDLO | PAUL | PEGGY |
| E205 | | SILVER | MARY LOUSIE | |
| A105 | A105 | SINGER | STANLEY | POLLY |
| B301 | | SJOBERG | HOLGER | NANCY |
| C701 | | SMITH | MILDRED | |
| D403 | | SMITH | JAMES | |
| G702 | | SMITH | BERNICE | |
| C406 | | SOLOMON | NATALIE | |
| C309 | | SOULAM | DONNA | |
| E502 | E-502 | SOUTH | THOMAS | GERTRAUD |
| D212 | | SPEAR | MILDRED | |
| C104 | | STARK | JUDITH | |
| F706 | | STARK | LUCY | |
| A502 | AL 273B | STEINER | HARRELL | DIXIE |
| F104 | | STERLING | MARY E. | |
| H201 | | STERNFELS | SANDRA | |
| A406 | A406 | STOCKING | JAMES | HELEN |
| D504 | | STRAUMAN | JOAN | |
| H401 | | STUART | JOAN | |
| D312 | D-312 | SUTTLE | THOMAS | DOROTHY |
| E203 | E203 | TALONE | JOSEPH | MILDRED |

| | | | | |
|---|---|---|---|---|
| A702 | A702 | TAYLOR | RALPH | PATRICIA |
| C511 | | TAYLOR | THERESA | |
| C702 | | TEMPLETON | GARY | |
| C411 | | THUER | VIOLET | |
| D111 | | TISON | URSULA | |
| G303 | G303 | TOCKMAN | MELVYN | BETH |
| G602 | | TRACEY | VIRGINIA | |
| D303 | | TRIPP | MARY | |
| A605 | | TUCKER | GLORIA | |
| H504 | H504 | TUCKER | CHARLES | CAROLYN |
| F401 | | TUEGEL | HARDY | |
| H302 | | TUTTLE | MARY LOU | |
| A706 | | UPTON | MURIEL | |
| C712 | | VAIL | LORA | |
| G204 | | VISGER | PHYLLIS | |
| B110 | B110 | WALKER | CALVERT | JEAN |
| E305 | AL 255 | WARD | IRA | PHYLLIS |
| A710 | | WATERMAN | ROSE | |
| A201 | | WEAVER | DIANE | |
| C107 | | WEISSING | DENNIS | |
| A408 | | WHATLEY | DOROTHY | |
| G404 | | WHEELER | DORIS | |
| A705 | A-705 | WHITING | DAVID | NORMA JEAN |
| B407 | | WILHELM | JOHN | |
| C211 | | WILLIAMS | PHYLLIS | |
| A401 | | WILLIS | RONALD | |
| D408 | NC 150W | WILSON | CARL | CECELIA |
| D512 | D512 | WILSON | J. BENNETT | AMY |
| E705 | E705 | WILSON | SIDNEY | PATRICIA |
| C102 | | WINDELBERG | NELL (EDITH) | |
| E601 | | WITTER | GLADYS M. | |
| H204 | | WOLFE | MARY LOU | |
| D108 | | YOUNG | WILLIAM | BARBARA |
| A403 | | ZIEGLER | ANNA | |
| | 301 | | | |
| **Villas** | | | | |
| N02 | N02 | BALTER | WILFRED | SHIRLEY |
| E31 | E31 | BARGER | JOHN | NELLY |
| S10 | | BENSON | MARY LOUISE | |
| W29 | | BOYD | MARY | |
| E08 | E08 | BOYSEN | ALBERT | BETTY |
| N10 | N10 | BUTZ | DONALD | KATHLEEN |
| S12 | S12 | BUTZ | ROBERT | JOSEPHINE |
| W09 | | BYRD | RONALD | |
| S21 | | DUNDON | JOSEPH | PAULA |
| W28 | W28 | EVANS | GEORGE | PAULINE |

| | | | | |
|---|---|---|---|---|
| N01 | | HEMSTREET | MARIJANE | |
| E28 | E28 | HOOD | WALTER | MARY GENE |
| N12 | N12 | JARRELL | SHELBY | DORA JANE |
| S23 | | KARPAY | IRWIN | |
| E05 | | KERNIS | JANET | |
| E07 | NC | LAFFAN | ANNE | JOHN |
| S03 | | LARMON | ROBERT | |
| W26 | W26 | LARSEN | EUGENE | MARWILDA |
| E09 | | LITTLEWOOD | DOROTHY | |
| S11 | | MATHEW | ALEX | |
| N24 | N24 | MAZURKIEWICZ | ALBERT | HELEN |
| N11 | | MORRIS | RACHEL | |
| E26 | E26 | NORD | WALTER | ANN |
| S01 | S01 | OVERHOLT | BRINTON | ANNE |
| W05 | W05 | PAPE | MELVIN | RITA |
| E30 | | PATTERSON | LESLIE | |
| S20 | | PETERSON | LEWIS | JOYCE |
| N21 | N21 | RAO | MUKUNDA | VIJAYA |
| W06 | | ROESELER | AUDREY | |
| S25 | | SCHMIDT | CAROL | |
| W31 | | SIDDHARTH | PADMANABHAN | SAROJA |
| N03 | | SIMON | ROBERT | |
| W08 | | STAPLES | MARILOU | |
| W30 | | VAN NESTE | MARTHA | |
| E27 | | WALKER | LUCIANNA | |
| E29 | | WOOLF | RYOKO | |
| E06 | | WRIGHT | RITA | |
| 37 | | | | |
| | | | | |
| 338 | | | | |
| | | | | |
| **Lifecare residents at the Health Center** | | | | |
| AL 303 | | AMOS | ROBERT | |
| AL 301 | | ANDERSON | CICELY | |
| AL 214 | | ANTINK | ELOISE | |
| AL 310 | | ANTONETTI | ROSA | |
| AL 320 | AL 246 | APGAR | CHARLES | MARY |
| AL 307 | | AUGUSTYN | LAURA | |
| AL 333 | NC 151W | BARRETT | SYDNEY | EVA |
| AL 324 | AL 322 | BARRIER | WILBUR | BETTY |
| AL 212 B | | BEACH | RUTH | |
| AL 222 | AL 263 | BLACKBURN | JOANNE | WALLACE |
| AL 201 | | BLANTON | L.D. | |
| AL 331 | | BOWMAN | JOHN | |
| AL 252B | | BURDGE | NANCY | |

| | | | | |
|---|---|---|---|---|
| AL 257 | | BUTCHER | DORIS | |
| AL 267 | | CAMPBELL | CONSTANCE | |
| AL 319 | | CARADONNA | VIRGINIA | |
| AL 308 | | CARLTON | PATTI | |
| AL 318 | | CHAMERLAIN | LORE | |
| AL 262 | | CHATTIN | MARGARET | |
| AL 306 | | CLARK | MARGARET | |
| AL 321 | | CURREY | BETTY | |
| AL 334 | | DAY | DOROTHY | |
| AL 300 | | DOUGLAS | BARBARA | |
| AL 273B | | EDSON | RETTA | |
| AL 244 | | ELLIOTT | DOROTHY | |
| AL 212A | | FORREST | VERONICA | |
| AL 315 | | GENN | MARGARET | |
| AL 260 | NC 146D | GRIER | JOHN | ESTHER |
| AL 330 | | GRIFFIN | JOHN | |
| AL 329 | | HILBURN | LARRY | |
| AL 245 | | HILL | HELEN | |
| AL 323 | | JANKURA | EDWIN | |
| AL 309 | | JEFFRESS | ELISABETH | |
| AL 204 | | JOHANSON | GERTRUDE | |
| AL 316 | AL 316 | KAAN | NICOLAAS | PEGGY |
| AL 217 | | KIRKMAN | ELOISE | |
| AL 272 | AL 272 | KONICEK | KAREL | IRMA |
| AL 258 | | LARSEN | GRACE | |
| AL 207 | | LARSON | VIRGINIA | |
| AL 248 | | LARSON | BERYL | |
| AL 259 | | LAVOIE | GABRIELLE | |
| AL 328 | | LEMMON | DOROTHY | |
| AL 336 | | LEWENTHAL | SHIRLEY | |
| AL 332 | | LOWENSTEIN | THELMA | |
| AL 224 | | MANN | AURORA | |
| AL 213 | | MANSBERGER | MAREN | |
| AL 304 | AL 304 | MEEHAN | FRANCIS | ELEANORE |
| AL 314 | AL 314 | MURRAY | ROBERT | EVELYN |
| AL 221 | | NEALE | RUTH | |
| AL 209 | | NEWKIRK | FRANCES | |
| AL 223 | | OSBORNE | ROBERT | |
| AL 220 | | PARKER | ELLEN | |
| AL 256 | | PROCTOR | ELIZABETH | |
| AL 225 | | QUIGLEY | DOROTHY | |
| AL 229B | | RANDLE | GERALDINE | |
| AL 302 | | REAVES | JEAN | |
| AL 206 | | SHEFFIELD | RUBY | |
| AL 335 | | STEWART | LUCILLE | |
| AL 261 | | STRUBLE | ANNA LEE | |
| AL 327 | NC 130D | SWANSON | DONALD | MARY |

| | | | | |
|---|---|---|---|---|
| AL 252A | | TOM | DOROTHY | |
| AL 208 | | VALDES | NORMA | |
| AL 338 | | VANDERSLUIS | MARCIA | |
| AL 210 | | WALKER | PHYLLIS | |
| AL 243 | | WALTERS | MILDRED | |
| AL 231 | | WHITE | JOHN | |
| AL 202 | | WHITNEY | ALBA JEAN | |
| AL 232A | | WILBER | ALICE | |
| AL 250 | | WISCHMANN | FRANCES | |
| AL 313 | | WITZELL | VIRGINIA | |
| AL 271 | AL 271 | WRIGHT | COURTNEY | DOLORES |
| AL 312 | | YATES | DOROTHY | |
| NC 102D | | KAHN | MARYANN | |
| NC 104W | | BULLERMAN | MARY | |
| NC 106P | | SPEICH | EDITH | |
| NC 107D | | HARRISON | MARY | |
| NC 109P | | BRADLEY | TAMMY | |
| NC 113D | | KLAMA | ELLEN | |
| NC 114D | | JOHNSON | MARIE | |
| NC 114W | | JACOBS | MARJORIE | |
| NC 117D | | LATINA | LAURETTE | |
| NC 117W | | WILLIAMS | MAUDE | |
| NC 119P | | VOGEL | BARBARA | |
| NC 122D | | FUTHEY | LUCY | |
| NC 123D | | MILLER | RUTH | |
| NC 128D | | STEFFEE | KATHERYN | |
| NC 128W | | CHAFER | MARIAN | |
| NC 131D | | BEURY | JOAN | |
| NC 131W | | CYBULSKI | JOAN | |
| NC 132D | | WINTERHALTER | LUCILE | |
| NC 147P | | TURK | EUGENE | |
| NC 148D | | HARKNESS | MARY LOU | |
| NC 148W | | REYNOLDS | PRISCILLA | |
| NC 150D | | DELVECCHIO | HAZEL | |
| NC 156D | | DRAGOTTA | ANN | |
| NC 156W | | CARROLL | MARGARET | |
| NC 157D | | WEIMAN | ELLEN | |
| NC 158D | | SHENBERGER | DONALD M. | |
| NC 160P | | LANDRY | MARGUERITE | |
| NC 164D | | HARLOW | AILEEN | |
| NC 164W | | PYLE | MARY | |
| NC 165D | | MANEY | MARY ELLEN | |
| NC 169W | | RYAN | JOYCE | |
| NC 170D | AL 317 | HOGAN | JACK | SARA |
| | | | | |

Assisted Living
Nursing Center

# UNIVERSITY VILLAGE RETIREMENT CENTER CONTRACTS

| Vendor | Service | Expiration |
|---|---|---|
| AgeWell | Management Services | 1/30/15 |
| AOD | Software License Agreement | Month to month |
| Aramark | Refreshment Services for marketing | 30 day advance |
| Ashberry | Water softener | 30 day advance |
| AT & T | Business Network Bundle Long distance, T1 line, 800 service | 30 day advance |
| AT & T | Transportation mobile phones | 30 day advance |
| Bayshore Solutions | Master Hosting | 30 day advance |
| Brighthouse (was Time Warner) | Cable | Dec. 31, 2017 |
| Cintas | Shredding | 12/13/16 |
| Critical System Solutions, LLC | Alarm monitoring | 30 day advance |
| Critical System Solutions, LLC | Test & Inspections | 30 day advance |
| Critical System Solutions, LLC | Test & Inspections Villas | 30 day advance |
| Ecolab | Dishwasher East & West machines including booster | 30 days advance |
| Ehrlich/Rentokil | Pest control quarterly in kitchen | 30 day advance |
| Ehrlich/Rentokil | Pest control for resident apartments | 4/25/14 |
| Electro Joe LLC | Fire pump inspection 2x/yr. | 30 day notice |
| FCS, Inc. | Grease traps, lift station, manhole | agreement |
| FedX | Ground Courier Service | 30 day notice |
| For Rent Media Solutions | Advertising for marketing | 2/2014 |
| Ford Credit | Financing Cars | 9/30/2015 |
| FPL | Natural Gas | Agreement |
| Laser Rite | Service Agreement | 7/11/2014 |
| Masterpiece | Service Contract | 8/12014 |
| McAfee | Email defense service | Month to month |

| McCoy | Lease & service agreements for ALF and nursing center | 30 days notice |
| Mosley Associates | Water Treatment | 30 day notice |
| MPLC | Motion Picture Licensing Corporation | 8/31/2014 |
| Naples Daily News | Advertising for marketing | Exp. 6/14 |
| Pitney Bowes | Postage machine | 6/30/2017 |
| Real Property Tax Advisors | Tax reduction Includes 3 properties | 30 day notice; however, work product charge upon termination |
| Red Bottom Boat | Gary Solomonson-marketing consultant | 30 day notice |
| Republic Waste Services | Garbage Pick Up | 1/3/15 |
| Rodan | Fire Sprinkler Inspection | 30 day notice |
| Sharps MD | Biomedical waste | 60 day notice |
| Suntrust Bank | Rental space for bank at UV | 10/31/2015 |
| Supermedia | Advertising for marketing White & yellow pages | 12/2014 |
| Tampa Tribune | Advertising for marketing | 7/2014 |
| TECO Peoples Gas | Gas | 10/29 90 day advance |
| Thyssenkrupp | Elevators 3 East Building 4 West Building | 12/21/14 |
| Touchtown | UV web portal service & software program | 30 day notice |
| TWC Services | Maintenance of chillers | 30 day advance |
| Tyco's ADT Security Services (formerly know as Brinks) | Security Services for Villas | 7 yr. after last Villa built |
| Unifirst | Maintenance uniforms. | 1/12/17 |
| University Mall (GGP, Inc.) | Employee parking | 2/28/14 |
| USF | Osher Lifelong Learning Institute | 7/2 30 day advance |
| Verizon | Phone switch | 12/31/2016 |
| Verizon | Cable lines | 12/31/2016 |
| Verizon | Internet Service | 30 day advance |
| Wells Fargo Financial Leasing | Copy machines | 7/11/2015 |
| YP | Advertising for marketing | 30 day advance |
| ZPH | Lawn Care | 30 day notice |

Rc contracts

# EXHIBIT B

## LIMITED PARTNERSHIP PURCHASE AGREEMENT

This Limited Partnership Purchase Agreement (LPPA) is entered into on this ____ day of September, 2013 by and between BVM Management/Westport Holdings, L.P., a Florida Limited Partnership (BVM Westport) as Purchaser, Westport Senior Living Investment Fund (WSLIF) as Seller.

WHEREAS BVM Westport proposes to purchase the 99% interest in WSLIF, which owns the 99% interest in Westport Holdings Tampa, L.P. (WHT) and Westport Holdings Tampa II, L.P. (WHTII).

WHEREAS existing Limited Partnership Agreements exist for both limited partnerships, more specifically shown on Attachment I.

WHEREAS both partnerships, shown on Attachment I, are existing Delaware limited partnerships conducting business lawfully in the state of Florida.

NOW THEREFORE in consideration of funds delivered and other good and valuable consideration, the Parties agree hereto as follows:

1. The Purchase Price for the 99% limited partnership interest in WHT and WHTII is two million five hundred thousand dollars ($2,500,000), payable as follows:

   a)    One million dollars ($1,000,000) to be paid at the Closing (as defined in Section 2 below) , then

   b)    One million five hundred thousand dollars ($1,500,000) to be paid (minus the Earnest Money deposit) at the time of the permanent loan placement. In the event HJ Simms & Company provides bridge and permanent loan financing, the entire two million five hundred thousand dollars ($2,500,000) shall be paid at closing.

   On or before October 4, 2013, provided Purchaser has received evidence of an executed loan extension agreement by and between Westport and its mortgagee, which agreement shall extend the loan terms to December 15, 2013 BVM Westport shall tender two hundred fifty thousand dollars ($250,000) to an account designated by the General Partner of the Seller, as a non-refundable Earnest Money deposit to be applied to the Purchase Price at closing. Additionally, Purchaser shall make an additional two hundred fifty thousand dollars ($250,000) non-refundable deposit on or before November 1, 2013, assuming loan extensions terms have been executed as set forth above. This additional earnest money deposit shall also be applied to the Purchase Price with the unpaid balance to be payable at closing.

2. Closing shall occur on the first day of the first month following the approval of the Agency for Health Care Administration (AHCA), provided, however, that if

rev 8/7/13

#25904812_v3

the Closing is not on December 1, 2013, the Closing shall take place no later than December 15, 2013. Upon the Closing, Purchaser shall payoff and discharge the existing mortgage indebtedness on University Village. Purchaser shall file its application with ACHA no later than October 4, 2013 and diligently prosecute said application.

BVM Westport acknowledges that the nursing facility is operating under a designation of "shelter care beds", which carries a specific designation under the Florida 651 statute governing Continuing Care Retirement Communities (CCRCs). BVM Westport has undertaken all sufficient due diligence with its investment banking firm, HJ Simms & Company, and has determined that the shelter care    beds designation would not impair the ability of HJ Simms & Company to provide the necessary financing for the acquisition of the limited partnership interests as well as the retirement of the mortgage indebtedness.

3. The General Partner acknowledges that the attached Limited Partnership Agreements are in full force and effect and there has been no further modification to those Agreements as of February 4, 2013, with the exception of certain Amendments to the Limited Partnership Agreements, previously disclosed.

4. Subsequent to the payment of the existing mortgage indebtedness, and as a condition of the Purchase Price set forth in Paragraph 1, the General Partners for both WHT and WHTII hereby consent to a modification of the Limited Partnership Agreements set forth in Article 10 of both Limited Partnership Agreements. The modified language shall read, in Section 10.02, 10.02(a), "Except as otherwise provided in Section 10.01, this Agreement may be amended from time to time only with the consent of the Majority-in-Interest of the Partners", provided no such amendment shall be in contravention of the Delaware Limited Partnership Act or in any matter increase the liability of the General Partners..

5. Except for the modification, as set forth above dealing with Article 10, and future amendments to the Limited Partnership Agreements, all other terms and provisions of both Limited Partnership Agreements shall remain in full force and effect until further notice.

6. BVM Westport agrees that the Purchase Price of two million five hundred thousand dollars ($2,500,000) is exclusive of amounts owed to the Limited Partnership from the operator of the healthcare center and assisted living facilities for funds advanced to, or owed by, the operator of the healthcare center and assisted living facility to the Limited Partnership. BVM Westport shall not have any rights, title or interest in accounts receivable, Notes receivable or any other form of indebtedness owed to the Limited Partnerships by the Operator of the healthcare center and the assisted living facility. Funds owed to the Limited Partnership may be funds owed for repayment of the line of credit, capital improvements, back rent or other obligations.

Page 2 of 5

rev 8/7/13

7.  BVM Westport agrees to hold each General Partner and the Management Company harmless and indemnify each General Partner and the Management Company from all liability, claims and costs associated with the project, including but not limited to, costs associated with the refinancing of the existing mortgage loans. Additionally, BVM Westport stipulates that it shall recognize the Collective Bargaining Agreement (CBA) and the multi-employer pension fund currently in effect at the health center property, leased by a third-party and at the independent living facilities. BVM Westport agrees to "bargain in good faith" an agreement of not less than three (3) years under the terms as set forth in the CBA and said multi-employer pension fund.

8.  BVM Westport hereby agrees that each General Partner shall remain as the defined legal representative for each limited partnership as set forth in the Limited Partnership Agreements. Agewell Senior Living Management shall manage the independent living facilities and receive the management fees for such work. The Management Fees associated with the healthcare center and skilled nursing facility are the exclusive property of BVM Westport. If BVM Westport wishes to take over management of the Health Center prior to Closing, it understands and acknowledges that any such management agreement is subject to the approval of the current lender and must be subordinate to the mortgage loan documents.

9.  Subsequent to the current mortgage indebtedness being paid in full, each General Partner and Management Company shall have the option to remain as General Partner and Management Company subject to the terms set forth under Paragraph 8 above, regarding compensation.

10. Construction interpretation of this Purchase Agreement shall be deemed to be governed by the laws of the state of Florida.

11. It is the intention of BVM Westport that both Limited Partnership Agreements shall remain in full force and effect, and that the sole modification of Article 10 shall not be deemed to compromise the ability of each General Partner to perform its duties pursuant to the Limited Partnership Agreements.

12. No General Partner nor any manager, officer, director shareholder, member or employee any General partner shall have any personal liability on this agreement or upon the bridge or permanent financing, which financing must be non-recourse.

[Signature Page to Follow]

rev 8/7/13

#25904812_v3

IN WITNESS WHEREOF this ___ day of September, 2013.


PURCHASER:
BVM Management/Westport Holdings, L.P. (BVM Westport)


By:_____

_____
Printed Name


SELLER:
Westport Senior Living Investment Fund  (WSLIF)



By:_____

_____
Printed Name



ACKNOWLEDGED AND CONSENTED TO BY:

General Partner Representative

#25904812_v3                                                    rev  8/7/13

By: _____

_____
Printed Name

rev 8/7/13

#25904812_v3

# EXHIBIT C

**HORIZON LP UV LENDER, LLC**

December 16, 2013

VIA FEDERAL EXPRESS

Westport Holdings Tampa, Limited Partnership
Westport Nursing Tampa, Limited Partnership
Westport Holdings Tampa II, Limited Partnership
Westport Senior Living Investment Fund, L.P.
11360 North Jog Road, Suite 102
Palm Beach Gardens, Florida 33418
ATTN: Mr. Lawrence Landry

RE:     Request for Deed in Lieu of Foreclosure

Dear Mr. Landry,

    Reference is made to that certain Loan Extension Agreement dated September 27, 2013 (the "Extension") and capitalized terms used in this letter have the meanings ascribed to them in the Extension.

    Pursuant to Article 7 of the Extension, Lender hereby makes demand that the Obligors execute and deliver to Lender (or an assignee of Lender to be determined) the Transaction Documents no later than Tuesday, January 14, 2014, which date is hereby designated as the Closing Date in accordance with the Extension Agreement, subject to Lender's rights to extend the Closing Date for up to thirty (30) additional days.

    Lender further makes demand that Borrower deliver a final Closing Schedule to Lender no later than December 30, 2013, and that Borrower deliver an estimated Post Closing Reserve Budget as soon as possible, prepared in accordance with Section 7.3 of the Extension.

    Lender further makes demand that Borrower immediately deliver to Lender, for application against the outstanding balance of the Loan Obligations, the non-refundable earnest money deposit held by Obligors in connection with that certain Limited Partnership Purchase Agreement between BVM Management/Westport Holdings, L.P. ("BVM") and Westport Senior Living Investment Fund, L.P. dated September 2013. Such funds shall be transferred by wire pursuant to the existing instructions for monthly payments.

Nothing in this letter shall be deemed to waive or release any rights of Lender set forth in the Extension, the Loan Documents, or otherwise.

We look forward to working with you and your legal counsel to move this transaction forward in an expeditious and amicable manner.

Yours very truly,

Craig A. Taylor
General Counsel

cc:     Philip J. Notopoulous, Esquire
        Holland & Knight LLP
        10 St. James Avenue
        Boston, Massachusetts 02116

# EXHIBIT D

**HORIZON LP UV LENDER, LLC**

January 31, 2014

VIA EMAIL AND OVERNIGHT COURIER

Philip J. Notopoulos, Esquire
Holland & Knight LLP
10 St. James Avenue
Boston, Massachusetts 02116
philip.notopoulos@hklaw.com

Dear Phil,

Horizon LP UV Lender, LLC ("Horizon") is in receipt of a letter dated January 28, 2014, from Dane Starbuck, who we understand represents BVM (a potential purchaser of the limited partnership interests in Westport Senior Living Investment Fund, L.P.). His letter proposes that Horizon extend the existing matured loans secured by University Village, or forbear from exercising the deed in lieu rights as described in the Loan Extension Agreement of September 27, 2013 (the "Extension Agreement"), until February 28, 2014, on terms further described in the letter. I assume that the Westport entities would agree to an extension on the terms proffered by Mr. Starbuck, but I do not believe he is representing the Westport entities as counsel.

Horizon has made several offers to extend the closing of the deed in lieu transaction, but thus far the terms we have offered have not been acceptable to your client or, apparently, to BVM. In a last attempt to facilitate a transaction whereby BVM would simultaneously take control of University Village and pay in full all amounts owed to Horizon, Horizon is prepared to offer the following terms to forbear from exercising its rights to close on the deed in lieu transaction under the Loan Extension. These terms are a very substantial reduction from our previous offers and represent a last and final offer.

1.      Borrower must immediately deliver to Horizon the $500,000 being held by Borrower in connection with the expired BVM Purchase Agreement of October 4, 2013, in accordance with the Extension Agreement. This sum will be credited against the outstanding loan balances.

2.      Borrower must pay an extension fee of $50,000. Horizon will use these funds to pay expenses incurred in connection with the Extension Agreement and preparations for the deed in lieu transaction, and accordingly these expenses will not be added to the outstanding loan balances as would otherwise occur.

3.      Borrower must place $100,000 in nonrefundable earnest money in an escrow account, to be automatically released to Horizon on February 28, 2014, without regard to whether BVM succeeds in its

attempt to acquire University Village. Horizon will credit this sum against the outstanding loan balances when received. Please note that this sum is roughly equivalent, on a dollars-per-day basis, to the sum paid by BVM under the October 4 Purchase Agreement.

4.    The sums required under items 2 and 3 must come from new sources, not existing assets of Borrower already the subject of Horizon's lien. I assume they would be funded by BVM. If so, I note that BVM has already offered to pay Horizon $150,000 in the event of a closing. Horizon requires that this amount be delivered now so that Horizon is assured of a source of funds to cover its out of pocket costs and demonstrate that BVM has the financial wherewithal to accomplish a closing.

5.    Borrower will agree to continue its cooperation with Horizon toward a possible deed in lieu transaction throughout the forbearance period. If February 28, 2014 passes without a full payment of all amounts owed to Horizon, Borrower will cooperate with Horizon and its representatives in accomplishing a deed in lieu transaction on March 15, 2014, including communications with residents and employees and on-site visits to conduct hiring processes.

6.    BVM must execute a waiver and release letter acknowledging the terms of the forbearance document and relinquishing any and all claims against Horizon, Westport, or University Village.

Please consider these terms and let me know if Borrower will be able to meet them.

Finally, Mr. Starbuck's letter contained an allegation that in some way, Horizon has "interfered" with or wrongfully contacted Borrower's employees. I am unsure in what capacity or on whose behalf Mr. Starbuck made these allegations, and do not believe the allegations to be founded in fact. All of Horizon's communications with the Westport entities and their employees have been conducted in full accordance with Horizon's rights under the loan documents and applicable law, generally through counsel, and cannot be said to "interfere" with Borrower in any way. I trust that if, as counsel to the Borrower, you have any concerns about Horizon's communications, you will bring them to my attention immediately.

Yours very truly,

Craig A. Taylor
General Counsel, Horizon LP UV Lender, LLC

CC:     Westport Holdings Tampa, Limited Partnership
        Westport Nursing Tampa, Limited Partnership
        Westport Holdings Tampa II, Limited Partnership
        Westport Senior Living Investment Fund, L.P.
        11360 North Jog Road, Suite 102
        Palm Beach Gardens, Florida  33418
        Attn:  Mr. Lawrence Landry
        llandry@westportadvisors.com

# EXHIBIT E

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

| | | |
|---|---|---|
| BVM UNIVERSITY VILLAGE, LLC, a<br>Florida limited liability company; and<br>BVM MANAGEMENT, INC., an Indian<br>company, | ) ) ) ) | Case No: |
| | ) | |
| Plaintiffs, | ) | Division: |
| vs. | ) ) | |
| HORIZON LP UV LENDER, LLC, a<br>Delaware limited liability company;<br>WESTPORT HOLDINGS TAMPA, LP, a<br>Delaware limited partnership; WESTPORT<br>HOLDINGS TAMPA II, LP, a Delaware<br>limited partnership; WESTPORT<br>HOLDINGS UNIVERSITY VILLAGE,<br>LLC; a Delaware limited liability company;<br>and WESTPORT HOLDINGS HIDDEN<br>SPRINGS, LLC., a Delaware limited<br>liability company; | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>VERIFIED COMPLAINT</u>

**COME NOW** the Plaintiffs, BVM University Village, LLC and BVM Management, Inc.,

hereafter collectively referred to as "BVM", by its counsel, for their claim for relief against the

Defendants, Horizon LP UV Lender, LLC ("Horizon"), Westport Holdings Tampa LP, Westport

Holdings Tampa II LP, (collectively "Westport LPs") and Westport Holdings UV, LLC and

Westport Holdings Hidden Springs, LLC ("Westport Holding") state and file their Complaint for

tortious interference and injunctive relief, seeking a finding for the Plaintiffs and enjoining the

General Partner of the Westport LPs from transferring its interest in a Health Center, Villas,

Independent Living and Assisted Living facilities to Defendant Horizon, as follows:

-1-

1.      BVM University Village, LLC is a limited liability company established in the State of Florida in July 2013 to hold ownership of a health center (skilled nursing facility), villas, independent living, and assisted living facilities known commonly and collectively as "University Village", Tampa, Florida.

2.      BVM Management, Inc. is a not-for-profit corporation established in 1950 in the State of Indiana to provide affordable senior housing and is the sole member of BVM University Village, LLC.

3.      Horizon LP UV Lender, LLC is a limited liability company established in the State of Delaware which purchased the financial note from a bankruptcy court to the real property known as University Village.

4.      Westport Holdings Tampa LP is a limited liability partnership established in the State of Delaware, which, along with Westport Holdings Tampa II LP, owns a 99% interest in "University Village".

5.      Westport Holdings Tampa II LP is a limited liability partnership established in the State of Delaware, which, along with Westport Holdings Tampa LLP, owns a 99% interest in "University Village".

6.      Westport Holdings UV, LLC is a Delaware limited liability company and the general partner of Westport Holdings Tampa LP and it owns a 1% interest in Westport Holdings Tampa LP and Westport Senior Living Investment Fund LP is the limited partner of Westport Holdings Tampa LP, owning a 99% in Westport Holdings Tampa LP.

7.      Westport Holdings Hidden Springs, LLC is a Delaware limited liability company, is the general partner of Westport Holdings Tampa II LP and it owns a 1% interest in Westport

-2-

Holdings Tampa II LP and Westport Senior Living Investment Fund LP is the limited partner of Westport Holdings Tampa II LP, owning a 99% in Westport Holdings Tampa II LP.

8.    Larry Landry is the authorized representative of both general partnerships of the LPs, those general partnerships being Westport Holdings U V, LLC and Westport Holdings Hidden Springs, LLC.

9.    "University Village", located at 12250 N. 22nd Street and 12401 N. 22nd Street, Tampa, Florida 33612, is a continuing care retirement community (CCRC) comprised of 722 units, including a 120 bed Health Center (skilled nursing facility), 46 unit villas, a 110 unit assisted living facility, and 446 independent living apartments in a complex that is home to more than 600 elderly residents.

## COUNT I TORTUTOUS INTERFERENCE

10.    Plaintiff has paid the consideration for the acquisition of said 99% ownership interest in the Westport LPs and is awaiting closing on refinancing loans for the Westport LPs and General Partners' interest in the CCRC, at which time the acquisition of the LLC membership interests is completed.

11.    Horizon is the existing mortgage lender to Westport Holdings Tampa, LP and also Westport Holdings Tampa II, LP and the Westport LPs are current with all payments of principal, interest, taxes, and escrow amounts due and owing to Horizon.

12.    Horizon has announced its intent to demand a deed in lieu of foreclosure in order to marshal over $20,000,000 in limited partnership equity, thus, imposing unfair and abusive loan terms that amount to predatory lending practices.

13.    The appraised value of University Village, the 722 unit CCRC, is $38,000,000, as determined by a qualified independent appraiser, and the mortgage debt is less than $19,500,000.

Horizon purchased the mortgage note from a Bankruptcy Court in 2012 for $12,000,000. This lender is motivated to "convert" the equity of the limited partnerships to its balance sheet, and for that reason, is resisting allowing the limited partnerships from paying their mortgage indebtedness.

14.    Horizon, the Mortgagee, is attempting to force the Mortgagor to execute a deed in lieu of foreclosure that the Plaintiffs contend is a "fraudulent transfer" on the grounds: a) that such a conveyance is not voluntary in Horizon coerced Mortgagor to enter into an agreement to deed said real property or else it would not grant a loan extension to the Mortgagor; b) that the mortgage debt is approximately $20,000,000 less than the fair market value of the property as determined by a third-party independent appraiser; and c) that the Mortgagor would become insolvent if the transfer of deed occurred, thus precluding the rights of other creditors and parties with equitable claims to an interest in the real property.

15.    Horizon has failed to cooperate to enable BVM to pay off the indebtedness owed to Horizon by demanding unreasonable terms and conditions that it knows cannot be met by BVM due to the structured indebtedness owed and the various parcels of real estate that comprise University Village.

16.    Nonetheless, Plaintiffs stands ready and able to cause local lender(s), satisfactory to the Court and within a reasonable time, to tender into the Court's registry an amount equal to payment in full of the outstanding mortgage debt owed by the Westport LPs.

17.    Transfer of the properties to Horizon at less than fair value would constitute a fraud upon creditors, and a fraud upon the members of Plaintiffs.

18.    Horizon has engaged in bad faith dealing, tortuous interference and has further exposed itself for claims of lender liability. The Plaintiffs have been damaged by the tortuous interference of the lender, and this interference has hampered the Plaintiffs in obtaining refinancing

-4-

proceeds to mortgage the limited partnerships' property.

19.    The Plaintiffs and/or their affiliates have obtained financing commitments to refinance the existing debt, but they cannot obtain the cooperation of Horizon to provide necessary information to the closing agent.    This lack of cooperation is deliberate, and is being used by Horizon to further impair the ability of the limited and general partnerships from paying the lender amounts owed under the current notes and mortgages.

**WHEREFORE**, Plaintiffs seek a finding against the Defendants for tortuous interference in preventing the Plaintiffs from completing their purchase of the limited and general partnership interests and for all other relief right and proper in the premises.

<u>COUNT II INJUNCTIVE RELIEF</u>

By reference, all paragraphs under Count I are hereby incorporated and asserted under Count II.

20.    A deed, including a deed in lieu of foreclosure, is ineffectual unless and until it is delivered.

21.    This Court, as a court of equity, has the equitable power and jurisdiction to enjoin the delivery of a deed such as the one demanded by Horizon where the conveyance of the property would constitute a fraud.

22.    Plaintiffs, on information and belief, believes that Horizon intends to demand actual physical possession of the facilities on or before February 14, 2014, and intends to send its agents, employees, and representatives to the business locations of those limited partnerships to oust incumbent management, and to take possession of those facilities.

23.    If Westport Holdings Tampa LP and Westport Holdings Tampa II LP lose management power and authority over said facilities, then the ability to refinance the mortgage loan

will have been thwarted, and Horizon as existing mortgagee will receive an unearned windfall.

24.     Plaintiffs will suffer irreparable injury if Horizon is permitted to take title and possession to the assets of Westport Holdings Tampa LP and Westport Holdings Tampa II LP, without Horizon paying full value as determined by Health Trust, an MIA independent third party appraiser, for such acquisition.

25.     Plaintiffs are seeking equitable relief, and are requesting an injunction, enjoining the Defendants from demanding a deed in lieu of foreclosure and further enjoining the Defendants from interference in the refinancing efforts of the limited and general partnerships, and to order the lender to engage in "no contact" with employees and elderly residents on the property of the limited partnerships.

26.     The Plaintiffs are also seeking injunctive relief from the lender accelerating the mortgage indebtedness until a reasonable time passes to allow for the limited partnerships to close on their refinancing with Plaintiffs.

**WHEREFORE**, Plaintiffs seek an order against the Defendants enjoining said Defendants from executing a deed in lieu of foreclosure to the real property in interest, from interfering in the operations of the facilities known as University Village, from accelerating the mortgage indebtedness and for all other relief right and proper in the premises.

## COUNT III.  DERIVATIVE ACTION

By reference, all paragraphs under Count I and Count II are hereby incorporated and asserted under Count III.

27.     The Plaintiff BVM University Village, LLC, as purchaser of 99% ownership of the Westport LPs, further requests that the authorized representatives of the General Partners of the Westport LPs be enjoined from executing any document, including deed, to the real property that

compromises or impairs the value of the limited partnerships.

**WHEREFORE**, Plaintiff BVM University Village, LLC, as 99% owner of the Westport LPs, further request that the Larry Landry or any other authorized representatives of the General Partners be enjoined from executing any document, including deed, to the real property that compromises or impairs the value of the limited partnerships and for all other relief right and proper in the premises.

Respectfully submitted on this 13th day of February, 2014.

BUDDY D. FORD, P.A.,


Buddy D. Ford, Esquire (FBN: 0654711)
Email: *Buddy@tampaesq.com*
Jonathan A. Semach, Esquire (FBN: 0060071)
Email: *Jonathan@tampaesq.com*
115 North MacDill Avenue
Tampa, Florida 33609-1521
Telephone #: (813) 877-4669
Facsimile #: (813) 877-5543
Office Email: *All@tampaesq.com*
Attorney for Plaintiffs

-7-

## VERIFICATION

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

BEFORE ME, the undersigned authority, personally appeared Robert J. Rynard, Sr., as President on behalf of BVM Management, Inc., Managing Member on behalf of BVM UNIVERSITY, LLC. and as President on behalf of BVM Management, Inc., after being duly sworn stated as follows:

The facts and circumstances asserted in the foregoing *Verified Complaint*, are true and correct and I have executed this verification, under penalty of perjury, to attest to the truth of the assertions made.

DATED on this 12 day of February, 2014.

BVM UNIVERSITY VILLAGE, LLC.,

By: BVM Management, Inc.
     Managing Member

By: *Robert L Rynard Sr Pres*
     Robert L Rynard, Sr., as President,
     Chairman, and Sole Member

BVM MANAGEMENT, INC.,

By: *Robert L Rynard Sr Pres*
     Robert L Rynard, Sr., as President,

SWORN to and SUBSCRIBED before me, this 12 day of February, 2014, by Robert J. Rynard, Sr., as President on behalf of BVM Management, Inc., Managing Member on behalf of BVM UNIVERSITY, LLC. and as President on behalf of BVM Management, Inc., who ☒ is personally known to me or ☐ produced _____ as Identification and who did take an oath.

NOTARY PUBLIC:

_Gerri M Long_
State of Florida at Large
INDIANA

-8-

## Exhibit "A"

### Parcel 1:

A parcel consisting of part of the Southeast 1/4 of Section 7, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section 8;

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to a point;

thence North 89° 56' 41" West (North 89° 58' 41" West), along the North line of the Northwest 1/4 of the Southwest 1/4 of Section 8, a distance of 1331.73 (1332.11) feet to the Northeast corner of the Northeast 1/4 of the Southeast 1/4 of Section 7;

thence North 89° 41' 16" West (North 89° 36' 57" West), along the North line of said Section 7, a distance of 30.00 (30.00) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 07' 35" West (South 00° 12' 25" West), a distance of 473.74 (473.97) feet to a point;

thence North 89° 46' 02" West (North 89° 37' 05" West), a distance of 100.00 (100.03) feet to a point;

thence South 45° 13' 58" West (South 45° 08' 11" West), a distance of 28.28 (28.23) feet to a point;

thence North 89° 46' 02" West (North 89° 42' 02" West), a distance of 219.97 (220.16) feet to a point;

thence North 00° 07' 35" East (North 00° 13' 21" East), a distance of 494.40 (494.35) feet to a point on the North line of the Northeast 1/4 of the Southeast 1/4 of Section 7;

thence South 89° 41' 16" East (South 89° 36' 57" East), along said North line a distance of 340.00 (340.00) feet to the POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM the East 6 feet thereof conveyed to Hillsborough County in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

NOTE: Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, of the Public Records of Hillsborough County, Florida.

**Parcel 2:**

The South 200 feet of the West 1/2 of Lot 8, Hankins Acres, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

**Parcel 3:**

The South 100 feet of the West 1/2 of Lot 7, and Lot 8, LESS the South 200 feet of the West 1/2 of said Lot 8, Hankins Acres, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM the East 6 feet of said Lot 8 conveyed to Hillsborough County, in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

TOGETHER WITH non-exclusive Easement rights as set forth in the Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 5832, Page 1191; as affected by First Amendment to Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 6129, Page 1653, both of the Public Records of Hillsborough County, Florida.

F:\DOCS\Robin\2667.42 Westport.Hillsborough County\Legal Descriptions\Westport Nursing Property.wpd

**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA**
*CIVIL DIVISION*

BVM UNIVERSITY VILLAGE, LLC, a
Florida limited liability company; and
BVM MANAGEMENT, INC., an Indiana
company,                                                    Case No.:

      Plaintiff(s),

vs.

HORIZON LP UV LENDER, LLC, a
Delaware limited liability company;
WESTPORT HOLDINGS TAMPA, LP, a
Delaware limited partnership;
WESTPORT HOLDINGS TAMPA II,
LP, a Delaware limited partnership;
WESTPORT HOLDINGS UNIVERSITY
VILLAGE, LLC, a Delaware limited
liability company; and WESTPORT
HOLDINGS HIDDEN SPRINGS, LLC,
a Delaware limited liability company;

      Defendant(s).

_____/


## NOTICE OF LIS PENDENS

**TO:   ALL DEFENDANTS NAMED ABOVE**

     **AND ALL OTHERS WHOM IT MAY CONCERN**

     **YOU ARE HEREBY NOTIFIED** of the institution of the above-styled action by the

above-named Plaintiffs  against You, seeking equitable and  other claims associated with the

property more specifically described in *Exhibit "A,"* attached hereto and  incorporated herein; said

property located in Hillsborough County, Florida:

-1-

Respectfully submitted on this ___ day of February, 2014.

**BUDDY D. FORD, P.A.,**

Buddy D. Ford, Esquire (FBN: 0654711)
Email: *Buddy@tampaesq.com*
Jonathan A. Semach, Esquire (FBN: 0060071)
Email: *Jonathan@tampaesq.com*
115 North MacDill Avenue
Tampa, Florida 33609-1521
Telephone #: (813) 877-4669
Facsimile #: (813) 877-5543
Office Email: *All@tampaesq.com*
Attorney for Plaintiffs

## Exhibit "A"

### Parcel 1:

A parcel consisting of part of the Southeast 1/4 of Section 7, Township 28 South, Range 19 East, Hillsborough County, Florida, described as follows:

From the Southeast corner of said Section 7, run North 00° 08' 00" East, along the East boundary of said Southeast 1/4 of Section 7, a distance of 61.28 feet to a point on the North Right-of-Way line of Fowler Avenue (S.R. No. 582);

thence South 89° 47' 00" East, along said North line a distance of 1331.61 feet to a point of intersect with the East line of the Southwest 1/4 of the Southwest 1/4 of Section 8;

thence North 00° 08' 05" East, (North 00° 07' 54" East), along said East line a distance of 1274.92 (1274.70) feet to a point, said point also being the Northeast corner of Southwest 1/4 of the Southwest 1/4 of said Section 8;

thence North 00° 07' 13" East, (North 00° 07' 13" East), along the East line of the Northwest 1/4 of the Southwest 1/4 of said Section a distance of 1330.63 (1330.58) feet to a point;

thence North 89° 56' 41" West (North 89° 58' 41" West), along the North line of the Northwest 1/4 of the Southwest 1/4 of Section 8, a distance of 1331.73 (1332.11) feet to the Northeast corner of the Northeast 1/4 of the Southeast 1/4 of Section 7;

thence North 89° 41' 16" West (North 89° 36' 57" West), along the North line of said Section 7, a distance of 30.00 (30.00) feet to the principal point and PLACE OF BEGINNING of the following description:

thence South 00° 07' 35" West (South 00° 12' 25" West), a distance of 473.74 (473.97) feet to a point;

thence North 89° 46' 02" West (North 89° 37' 05" West), a distance of 100.00 (100.03) feet to a point;

thence South 45° 13' 58" West (South 45° 08' 11" West), a distance of 28.28 (28.23) feet to a point;

thence North 89° 46' 02" West (North 89° 42' 02" West), a distance of 219.97 (220.16) feet to a point;

thence North 00° 07' 35" East (North 00° 13' 21" East), a distance of 494.40 (494.35) feet to a point on the North line of the Northeast 1/4 of the Southeast 1/4 of Section 7;

thence South 89° 41' 16" East (South 89° 36' 57" East), along said North line a distance of 340.00 (340.00) feet to the POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM the East 6 feet thereof conveyed to Hillsborough County in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

NOTE: Bearings and distances in parenthesis are measured bearings and distances, per Special Warranty Deed recorded in Official Records Book 4486, Page 248, of the Public Records of Hillsborough County, Florida.

## Parcel 2:

The South 200 feet of the West 1/2 of Lot 8, Hankins Acres, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

## Parcel 3:

The South 100 feet of the West 1/2 of Lot 7, and Lot 8, LESS the South 200 feet of the West 1/2 of said Lot 8, Hankins Acres, according to the Plat thereof, as recorded in Plat Book 31, Page 51, of the Public Records of Hillsborough County, Florida.

LESS AND EXCEPTING THEREFROM the East 6 feet of said Lot 8 conveyed to Hillsborough County, in instrument recorded in Official Records Book 5068, Page 1265 of the Public Records of Hillsborough County, Florida.

TOGETHER WITH non-exclusive Easement rights as set forth in the Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 5832, Page 1191; as affected by First Amendment to Amended and Restated Declaration of Easements, Covenants and Conditions, as recorded in Official Records Book 6129, Page 1653, both of the Public Records of Hillsborough County, Florida.

F:\DOCS\Robin\2667.42 Westport.Hillsborough County\Legal Descriptions\Westport Nursing Property.wpd

# EXHIBIT F

| | |
|---|---|
| **From:** | John Bartle |
| **To:** | Hynek, Kimberly |
| **Cc:** | Larry Landry; llandry@mymasterpieceliving.com |
| **Subject:** | Pending Litigation |
| **Date:** | Sunday, March 02, 2014 10:24:23 AM |

Kimberly, I want to clarify the litigation issue for Horizon etal, since you all may of received a "mixed signal" from last weeks Voluntary Dismissal of the first Complaint.   There were some errors in the first Complaint that needed to be corrected.  Under Florida law, those corrections/amendments would have required the Plaintiff Parties to see "leave" of the Court to make the corrections. Additionally, the Plaintiff's suspected Horizon's Florida counsel would have objected to the "Motion for Leave to Correct Errors", therefore, it was simply easier to file a Voluntary Motion to Dismiss, without prejudice, so a new Complaint can be re-filed.

To be clear, a new Complaint will be filed, naming the same Defendant Parties, including Horizon. Injunctive Relief will be sought to enjoin the General Partner from accepting or delivering a deed in lieu of foreclosure (which is a fraudulent conveyance under Florida Statutes), and the Plaintiffs will seek a Mandatory Injunction against Horizon etal to show the Court what interest, if any, Horizon holds as equity in the property or unpaid loan amounts due Horizon etal, from the mortgagor.  The Plaintiffs have standing, and those Plaintiffs may seek additional remedies against certain Defendant Parties, under the law or equity, should Horizon etal continue to interfere with the Plaintiff's efforts to refinance the existing indebtedness.

**John Bartle**
**AmeriCare Partners**
*a BVM Management affiliate*
**PO Box 501188**
**Indianapolis, IN 46250**
**317-863-1060 efax**
**317-627-0504 direct dial**
http://bvmmanagement.com/